[L. A. No. 26464.   In Bank.   Apr. 25, 1963.]

P. J. HEALY et al., Plaintiffs, Cross-defendants and Appellants, v. GERALD E. BREWSTER, Defendant, Crosscomplainant and Respondent.

James D. Garibaldi, Warren J. Lane and Abe Mutchnik for Plaintiffs, Cross-defendants and Appellants.

Harold W. Kennedy, County Counsel, Lloyd S. Davis, Deputy County Counsel, Samuel Gorlick, City Attorney (Burbank), Eldon V. Soper, Assistant City Attorney, Robert E. Reed, Harry S. Fenton, Kingsley T. Hoegstedt, Orrin F. Finch and William S. Ashton, Jr., as Amici Curiae on behalf of Plaintiffs, Cross-defendants and Appellants.

R. H. Reeve, Enright, Elliott & Betz, Joseph T. Enright and Norman Elliott for Defendant, Cross-complainant and Respondent.

Leon J. Garrie as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

McCOMB, J.—Plaintiffs and cross-defendants (hereinafter referred to as "appellants"[1]), after trial before a jury, appeal from a judgment in the sum of $61,108.05, plus $16,000 for attorneys' fees as an item of costs, entered in favor of defendant and cross-complainant (hereinafter referred to as "respondent") in an action to recover on a construction subcontract.

*Facts:* August 26, 1958, appellants entered into a contract with the County of Los Angeles for the complete construction of an airstrip at the General William J. Fox Airfield in Lancaster, California.

Part of the required work consisted of clearing and grubbing the job site and building a dirt embankment of subsoil for the airstrip. In June 1958, prior to the execution of the prime contract, appellants called respondent's office to inquire if he would be interested in bidding for the subcontract for the clearing, grubbing, and embankment work. The call was received by respondent's son, Donald Eugene Brewster.

After taking the call, Donald went to appellants' office in Palmdale, California, and talked with Mr. Doyle Hallam. Thereafter he and Mr. Hallam went to the site of the prospective airport project, which was then merely open country. Their whole visit lasted between an hour and an hour and

---

[1]Plaintiffs and cross-defendants are P. J. Healy, individually and doing business under the name of Healy Construction Co., Arrow Petroleum Co., Arrow Road Construction Co., Arrow Equipment Co., and Healy Enterprises, Inc., a joint venture. Fireman's Fund Indemnity Company and Fireman's Fund Insurance Company, bonding companies for plaintiffs and cross-defendants, are cross-defendants and also appeal; but in the statement of the facts herein the reference to "appellants" is intended to include only the members of the joint venture.

a half, and Donald's entire examination of the site consisted in looking around at the general vicinity and at the surface area.

Donald also looked at the job plans and specifications furnished appellants by the county, particularly exhibits 5 and 6. Both exhibits were prepared exclusively by the Department of the County Engineer of Los Angeles and submitted to appellants (along with other prime contractors) at the time their bid was invited.

Exhibit 5 is entitled "Location of Borings" and indicates the location of certain borings made in the soil at the job site, while exhibit 6 indicates that it is a "Log of Borings." The latter bears a "Soil Analysis and Classification" chart of the borings taken by the county and designates the types of soil found in the borings by means of certain mechanical analysis tests. In order to make these tests, which consisted of sieving the particles through various fine screens, it was first necessary to pulverize the natural soil taken from the borings.

Appellants had nothing to do with the preparation of the job plans and specifications or with the soil tests and analyses shown thereon.

After Donald and Mr. Hallam visited the job site, they returned to appellants' offices. There Donald studied the plans and specifications for an additional hour and a half. The next day, after conferring with respondent by telephone, he informed Mr. Hallam that respondent would agree to do the clearing and grubbing for a set sum and the embankment work for 28½¢ per cubic yard.

The specifications which Donald examined provided: "The bidder shall examine carefully the site of the work contemplated and the proposal, plans, specifications, and contract forms therefor. It will be assumed that the bidder has investigated and is satisfied as to the character, quality, and quantities of the work to be performed and materials to be furnished, and as to the requirements of the specifications, the special provisions and the contract.

"The plans for the work show conditions as they are supposed or believed by the County Engineer to exist, but it is not intended or to be inferred that the conditions as shown thereon constitute a representation or warranty, express or implied, by the County or its officers, that such conditions are actually existent nor shall the Contractor be relieved of the liability under contract, nor the County or any of its officers be liable for any loss sustained by the Contractor as

a result of any variance between conditions as shown on the plans and the actual condition revealed during the progress of the work or otherwise.''

Some time in July, two months before respondent signed a subcontract with appellants and commenced work on the job, respondent received a telephone call from appellants stating they ''were having a ground-breaking ceremony and wanted to know if he would get some equipment into the job.'' As a result, respondent moved two bulldozers, a motor grader, a Caterpillar motor grader, and a water pump out to the job site.

This equipment remained on the site for about two months before respondent signed the subcontract with appellants, but at no time was it ever used to check the nature of the soil below the surface. Donald never made any actual investigation of the condition of the soil at any time prior to the commencement of the actual embankment work, although he did observe some excavating and farming operations in the vicinity.

Respondent's own investigation of the job site consisted of looking around at the surface on two occasions, and no one in his employ ever checked the actual soil condition below the surface prior to the commencement of the embankment work.

Respondent executed the subcontract with appellants on September 8, 1958, and commenced work the latter part of that month.

The subcontract contained this provision: ''The General Contractor shall be at liberty any time before the completion or during the construction of the work or any part thereof, to order any extra work to be done, to order the omission of any work originally included in this Agreement, and to make any changes in the work which the General Contractor may deem expedient, whether such changes increase or diminish the work to be done; but no such changes shall be made except upon written order of the General Contractor, signed by an executive officer, stating the additional time allowed, if any, and the amount to be added to or deducted from the Contract Price. Unit prices, if any are named in this contract, shall be used in determining the value of any such changes, additions or deductions.''

On or about October 17, 1958, respondent commenced digging in the first borrow pit, to begin the embankment work.

The procedure to be followed was to dig earth from an area designated as a "borrow pit," move it to the airstrip area, and there compact it in place as a subgrade for the airstrip or taxi-way.

Respondent had a foreman-superintendent, Robert W. Hanna, in charge of this work. Donald was on the job some days during the week. When he first commenced this work, Mr. Hanna dug a hole in the borrow area with a bulldozer, part of the equipment that had been brought to the job two months before for the ground-breaking ceremony. He then discovered that about 6 inches below the surface the soil was in a cemented state, which respondent has described as "hardpan." Nothing was said to appellants about this cemented material at that time.

On or about October 27, 1958, respondent's workers again encountered this cemented material. Thereafter there ensued a series of complaints about the cemented soil by respondent and Donald to various representatives of appellants. Respondent contended that his costs of operation were raised by the necessity of working with this cemented soil. Both respondent and Donald testified that they were frequently assured by these individuals that something would be done about the cemented material, "that we would be compensated in some way for it."

Respondent completed his work on the project on or about August 3, 1959.

He had sent appellants frequent invoices for progress payments while the job continued. All were for the contract price of 28½ cents per cubic yard for the embankment work. While on the job he never requested in writing payment of any sum above the contract price. He did not discuss with appellants what amounts would be paid him as extra compensation for working with the cemented materials or the basis on which extra compensation would be paid.

Two months after completing his work, respondent sent appellants a bill for $67,038.70, which represented his first written request for extra payment.

December 12, 1959, Mr. Oliver, on behalf of appellants, sent a letter to the County of Los Angeles, reading in part as follows: "Attached are photostat copies of additional claims by Gerald Brewster for D8 tractor and disc used to attain the required compaction of material from the borrow pit and for watering costs for additional yardage moved.

"We respectfully submit the claims by Gerald E. Brewster for your consideration and approval of additional expenditure as outlined herein."

December 17, 1959, Mr. Lambie, County Engineer, replied, refusing to pay any additional sum for the embankment work.

On or about December 4, 1959, respondent filed a "stopnotice" with the county, requiring it to withhold money still unpaid to appellants, and claiming that respondent was entitled to receive an additional sum of $93,023.74 from appellants.

Thereafter appellants filed a complaint for declaratory relief, and respondent filed a cross-complaint, in which he prayed for $387,483.49, less the sum already paid him.

The first cause of action of the cross-complaint, the basic pleading directed against appellants, was pleaded under the alternate theories that respondent either performed extra work under the contract, for which he was entitled to the sum prayed, or that appellants breached the contract, for which respondent was still entitled to the sum prayed.

At the conclusion of respondent's case, which proceeded first, appellants made a motion for a nonsuit. The trial court indicated that it was not yet ready to rule on the motion and suggested that appellants go ahead with their defense.

Appellants thereupon presented their defense, prior to the court's ruling on the nonsuit. At the conclusion of appellants' defense the trial court informed counsel for respondent that his cross-complaint, predicated on the theories of extra work and breach of contract, was in error, and suggested that he should have pleaded promissory estoppel. He said to respondent's counsel: "When the Court discussed this with all of you gentlemen before we commenced the trial, you were relying on the theory that there had been a breach of contract here, alleging that the general contractor had breached the contract by reason of his failure to supply the materials agreed upon. I don't think the evidence and the law has borne you out in that contention. And your next theory was if there were not a breach of the contract that you were nevertheless entitled to recover for extras, and I don't think that the evidence has borne you out or a proper reading of the contract has supported you in that position."

The court further stated that respondent might, however, be entitled to recover more than the basic contract price on a theory of promissory estoppel, and informed counsel that it

would entertain a motion by respondent to amend his cross-complaint to conform to proof of promissory estoppel.

Subsequently counsel for respondent submitted the draft of an "Amendment to Cross-Complaint to Conform to Proof," to which the court suggested certain changes. Thereafter the revised amendment was filed and made of record, whereupon counsel for appellants objected to the action of the court in allowing respondent to file the amendment to conform to proof, on the ground of such surprise, occurring after both sides had completed their cases, as to prejudice the rights of appellants.

The trial court then denied the motion for a nonsuit and also a motion by appellants for a directed verdict.

The jury was given a number of instructions relating to the elements and scope of the doctrine of promissory estoppel. At the same time the court advised counsel not to submit any further instructions on the subjects of additional pay for "extra work" and breach of contract and refused those already submitted on those subjects except two instructions advising the jury that as a matter of law respondent was not entitled to recover for "extra work" under the contract[2] and that appellants had not breached any provisions of the contract.

The court also instructed the jury that there had been a mutual mistake of fact on the part of appellants and respondent regarding the nature of the soil to be excavated, and that the execution of the contract having been conditioned thereon to a considerable degree, respondent for a reasonable time after discovering the mistake had the right to rescind the contract, but that he had not exercised such right.

The jury brought in a verdict for $94,813.30 by a vote of 10 to 2. Appellants then moved for judgment notwithstanding the verdict, reserving the right to move for a new trial.

Respondent filed a memorandum of costs, in which he requested "a reasonable sum" for attorneys' fees. Appellants filed a motion to tax costs, in opposition, and, in addition, made a motion for a new trial, including as one ground surprise by the granting of leave to amend to conform to proof.

The trial court consolidated the hearings on the motions for

[2]To this instruction the court added on its own motion: "However, you are instructed that Brewster [respondent] may be entitled to recover damages from Healy [appellants], on the basis of the doctrine of promissory estoppel as hereinafter defined, for additional services rendered by Brewster by reason of the presence of hardpan in the two borrow pits."

judgment *n.o.v.*, costs, and new trial. At the time of the consolidated hearing, it denied the motion for judgment *n.o.v.*, granted $16,000 for attorneys' fees as costs, and granted the motion for a new trial unless respondent remitted the difference between the jury verdict of $94,813.30 and $61,108.05. Respondent filed an acceptance of the remission.

*Questions:* First. *Did the trial court commit prejudicial error in allowing respondent to amend his cross-complaint to conform to proof of promissory estoppel and instructing the jury that respondent might be able to recover on the basis of such doctrine?*

*Yes.* ■ The doctrine of promissory estoppel is inapplicable where the promisee's performance was requested by the promisor at the time the promise was made. (Cf. *I. & I. Holding Corp.* v. *Gainsburg,* 276 N.Y. 427 [12 N.E.2d 532, 534 [8,9], 115 A.L.R. 582].)

■ Under such circumstances, the only reliance which can make the promisor's failure to perform actionable is the promisee's doing what was requested. If that reliance was detrimental, it would constitute consideration. If it was not detrimental, it would not constitute consideration; and since detrimental reliance is an essential feature of promissory estoppel, that doctrine could not be invoked to make the promisor liable. (See Snyder, *More on Promissory Estoppel* (1959) 26 Brooklyn L.Rev. 41; Snyder, *Promissory Estoppel in New York* (1948) 15 Brooklyn L.Rev. 27.)

■ In other words, where the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel.

■ In the present case respondent's evidence shows that appellants requested his performance at the time the alleged promise was made, thus bargaining for his reliance.[3]

---

[3]Respondent's son Donald testified: ''He [Mr. Thomas, appellants' job superintendent] told me . . . to go ahead and keep on moving the material, that we would be compensated in some way for it. . . . He [Mr. Clikeman, appellants' general manager] told me to go ahead and perform the work, that they would get something done on it, see we were compensated for handling this material. . . .''

Respondent testified: ''Joe Thomas told me . . . to go ahead . . . and that now he was going to have the time . . . to get in and fight the situation out and get it settled. . . . And he [Mr. Collins, appellants' job engineer] says . . . 'We are into this thing just as bad as you are,'

Accordingly, the doctrine of promissory estoppel is inapplicable.

■ Moreover, the judgment cannot be affirmed on the theory that the promise and requested reliance constituted an executed oral modification of the original contract (Civ. Code, § 1698), even if the facts necessary to support that theory are inherent in the jury verdict on promissory estoppel.

The case was tried as an action to recover under the original contract. The pleadings gave appellants no notice that recovery was sought on an oral modification of the original contract. Their trial tactics might well have been different had they known the importance of the oral promise during the trial. If the judgment were affirmed on the theory of an executed oral modification, appellants would be deprived of their right to defend on the issues raised by that theory. (See *Lavely* v. *Nonemaker,* 212 Cal. 380, 385 [4] [298 P. 976]; *Richter* v. *Adams,* 19 Cal.App.2d 572, 577 [2] [66 P.2d 226].)

■ Second. *May this court affirm the judgment on one of the theories pleaded in the original cross-complaint?*

*No.* In his original cross-complaint respondent sought to recover either (1) additional payment for ''extra work'' performed under the contract or (2) damages for breach of contract. The trial court found that there had been a failure of proof on both theories and instructed the jury that as a matter of law respondent was not entitled to recover under either theory, refusing all other proposed instructions relating thereto.

Since the question of respondent's right to recover under either theory was withdrawn from jury consideration, and appellants were not allowed to argue to the jury thereon or to submit instructions on issues involved, for this court to affirm the judgment on either such theory would amount to a denial of appellants' constitutional right to a jury trial thereon. (*Phillips* v. *G. L. Truman Excavation Co.,* 55 Cal.2d 801, 808 [8] [13 Cal.Rptr. 401, 362 P.2d 33]; *Shippy* v. *Peninsula Rapid Transit Co.,* 197 Cal. 290, 294 [2] [240 P. 785]; *Garcia* v. *San Gabriel Ready Mixt,* 155 Cal.App.2d 568, 571 [1] [318 P.2d 145] [hearing denied by the Supreme Court].)

Furthermore, there was conflicting evidence with respect to

and he said, 'Let's get in and get this thing done, and you will get paid for what you do.' . . . Mr. Oliver [attorney-in-fact for appellants] said, 'Mr. Brewster, I am a fighter,' and he says, 'You just go ahead and we will get something done about it.' ''

some of the issues involved under those theories; and where the trier of fact has not considered a theory under which the evidence is conflicting, it is improper for this court to affirm on the basis thereof. (*Kyne* v. *Kyne*, 60 Cal.App.2d 326, 332 [4] [140 P.2d 886] [hearing denied by the Supreme Court].)

In view of these conclusions, it is unnecessary to discuss other alleged errors.

The judgment is reversed, and a new trial is granted.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., Tobriner, J., and Peek, J., concurred.