[Civ. No. 29718.    Second Dist., Div. Five.    June 2, 1967.]

P. J. HEALY et al., Plaintiffs, Cross-defendants and Appellants, v. DORA A. BREWSTER, as Executrix, etc., Defendant, Cross-complainant and Respondent.

Garibaldi & Lane and Warren T. Lane for Plaintiffs, Cross-defendants and Appellants.

Enright, Elliott & Betz, Joseph T. Enright, Norman Elliott and Kenneth J. Murphy, Jr., for Defendant, Cross-complainant and Respondent.

FRAMPTON, J. pro tem.*—Appellants, joint venturers, will be hereinafter referred to as Healy.[1] Respondent Dora A. Brewster, executrix of the estate of Gerald E. Brewster, deceased, will be hereinafter referred to as Brewster.[2]

## The Facts

Healy, as general contractor, and Brewster as an earthwork subcontractor, entered into a subcontract whereby Brewster agreed to do embankment work upon an air strip at the Fox Airport in Lancaster, California, which Healy was constructing for the County of Los Angeles. That portion of Brewster's work out of which this litigation arose involved the removing of soil from designated "borrow pits," transporting it, and compacting it in place as the subsoil for the air strip. The contract required the excavation, transportation and compaction of approximately 182,000 cubic yards of material identified in the specifications as sand, three types of sandy loam, and a small amount of silty clay. The specifications further provided that where rocks, shale, clay, hardpan or other material unsatisfactory for subgrade was encountered, it should be excavated to a depth of at least 12 inches below the contemplated surface of the subgrade and the portion so excavated refilled with suitable selected material,

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1]Firemans Fund Indemnity Company, Healy's surety, although one of the named defendants in Brewster's amended cross-complaint, against whom judgment was also entered, did not join Healy in this appeal.

[2]Gerald E. Brewster died after the first trial, and by stipulation, his widow, Dora A. Brewster, was substituted as defendant and cross-complainant herein.

which material would be taken largely from the borrow pits.

As a part of the specifications, the county supplied prospective bidders with sheets which purported to report the county engineer's extensive subsoil boring programs, composed of (1) plats entitled "Location of Borings," showing the borrow pit area and the specific location of 69 borings; and (2) a chart entitled "Log of Borings," which contained on the left, vertical bar profiles (or logs) of 50 borings of the original borrow pit with related legends (e.g., "sandy loam") and on the right, a "soil analysis and classification" table of such borings. In the legend for the vertical profiles or logs of borings, the subsurface materials were identified largely as sand and sandy loam and no material in the borrow pits was identified as the "unsatisfactory" hardpan required by the specifications to be removed from the air strips or runways.

Such borings of sites for constructive projects is a common practice in modern engineering. Conventionally, it consists of using a tool or drill with a hollow cylindrical bit for cutting out a "core" from the subsurface, and a core barrel to receive the core. The composition of the core, so extracted, can then be analyzed and reported, and its structure plotted as a vertical profile or "log."

The only equipment used here by the county engineer in his extensive boring program was a rotary earth drill, which ground up the subsoil in the process of propelling the materials into the bucket. Although the materials as analyzed by the laboratory, which formed the basis for the tabular report attached to the specifications, were not in their natural state, the logs of the borings purported to show a vertical subsoil profile, and no notice was given to bidders of the unconventional method used by the county engineer which pulverized the subsoil samples instead of removing them in the form of an undisturbed core.

Donald E. Brewster, the son of Gerald E. Brewster, deceased, made a one and one-half hour visual inspection of the airport site and correlated the site with the plans, including the boring sheet. He assumed that the borings reported had been obtained by the standard method with which he was familiar. He studied the boring log sheets for three to four hours and computed the quantity of sandy loam shown thereon as the basis for estimating his costs in preparing to bid. He talked to Healy's representative at the job site before submitting the bid of Brewster. Donald testified, "I told him

that I was curious, they had these corings and that I—I hadn't been down in the area, I was wondering whether that area was roughly the same all over as far as soil conditions or anything like that. He said, as far as he knew it was, and the County had cored it out there, which I had the coring sheets on it.''

Expert witnesses called on behalf of the respondent testified in substance that ''hardpan'' has all of the characteristics of rock; that the log borings affirmatively identified the character of the materials in the borrow pits as sand and sandy loam; that the purpose of such borings and charting their contents as logs is to determine the quantities of suitable material for the subgrade and to advise bidders of the kind of materials they would be working with; that sandy loam materials when spread could be compacted with two or three passes of a pneumatic compactor, whereas the breaking up of hardpan required an entirely different treatment; that any experienced person studying the logs would reasonably understand that there was no ''hardpan'' to be encountered, but on the contrary that the material as cored by the county engineer had been found to be sandy loam.

Shortly after Brewster moved into the first borrow pit to start excavating he encountered large amounts of hardpan material instead of the expected soft sandy loam. Brewster had made no independent corings and relied upon the corings made by the county.

There followed a series of conversations between Brewster and Healy or the latter's duly authorized representatives. In these conversations Brewster called attention to the unexpected hardpan conditions and repeatedly was told by Healy's foreman, engineer and attorney-in-fact to go ahead and rip up the hardpan, compact it and put it down; that Brewster would be compensated for the extra expense. In some of the conversations Brewster was told that Healy would take up the matter with the county and get a settlement but that Brewster was to continue billing on the basis specified in the subcontract in the meantime. With extra expense continuing to mount, at one stage of the proceedings Brewster refused to continue further until some settlement was made for the extra expense, at which point he received a telegram from Healy directing him to resume the work, being assured verbally by Healy's representatives that he would get paid for what he did.

The evidence disclosed that the existence of the hardpan material in the borrow pits required Brewster to utilize large pieces of earth-excavating equipment which would not have been necessary had the material in the borrow pits conformed to that indicated in the specifications. This equipment was necessary in order to rip up the hardpan, break up the large chunks by means of huge disks and the use of water-sprinkling equipment, and in addition required an entirely different type of heavy equipment to pulverize the hardpan lumps and to compact the material. The time required to excavate and compact the material was estimated at three to four times the time required to compact sandy loam. Neither Healy nor his representatives did anything about trying to solve the problem with the county until after Brewster had completed his work. At that time Healy made a claim upon the county which was rejected. Brewster was then told by Healy's representative that nothing further was being done about the extra expense, that ". . . we don't care about our subcontractors, we don't care if they do go broke."

There was testimony that Mr. Collins, the chief engineer for Healy, in urging Brewster to continue the work after the latter had stopped pending some settlement of his claims, advised Brewster that he had had a discussion with the county and that although the county was still within its budget, if they paid any more, the contract would have to be rebid. When Brewster replied that this is the way it would have to be, Collins replied, " 'Now, look, Brewster,' he said 'We have been crushing rock, we have got a new rock plant, we moved in a portable plant, we have got a new pit, we have opened this new pit, we have crushed a pile of rock to build this airport with, and we have got a lot of money tied up in it. . . . Let's get in and get this thing done, and you will get paid for what you do.' " Brewster had to excavate, haul and compact some 413,568 cubic yards of material instead of the 182,000 cubic yards as originally called for in the contract. The total estimated cost to Brewster arrived at by using equipment rental rates on a monthly basis of rates published by the Associated Equipment Distributors in completing the job was $352,258 as opposed to his original bid of $51,870.

Under the terms of the subcontract, Brewster agreed to be bound by all of the "applicable" conditions imposed upon Healy in Healy's contract with the county. The prime contract by which Brewster was also bound provided that: "The bidder shall examine carefully the site of the work contem-

plated and the proposal, plans, specifications, and contract forms therefor. It will be assumed that the bidder has investigated and is satisfied as to the character, quality and quantities of the work to be performed and materials to be furnished, and as to the requirements of the specifications, the special provisions and the contract.

"The plans for the work show conditions as they are supposed or believed by the County Engineer to exist, but it is not intended or to be inferred that the conditions as shown thereon constitute a representation or warranty, express or implied, by the County or its officers, that such conditions are actually existent nor shall the Contractor be relieved of the liability under contract, nor the County or any of its officers be liable for any loss sustained by the Contractor as a result of any variance between conditions as shown on the plans and the actual condition revealed during the progress of the work or otherwise.''

There was a further provision which precluded the county engineer from advising subcontractors while plans were figured or during construction.

Judgment upon the first trial was in favor of Brewster. This judgment was reversed in *Healy* v. *Brewster*, 59 Cal.2d 455 [30 Cal.Rptr. 129, 380 P.2d 817], the Supreme Court holding that the trial court had committed prejudicial error in allowing Brewster to amend his cross-complaint to conform to proof of promissory estoppel and instructing the jury that Brewster might be able to recover on the basis of such doctrine, since Brewster's evidence showed that Healy had requested his performance at the time the alleged promise was made, thus bargaining for his reliance, and hence the doctrine of promissory estoppel was inapplicable. The court also held that Healy was entitled to a trial on the issue of whether there had been an executed oral modification of the contract even if the facts necessary to support that theory are inherent in the jury verdict on promissory estoppel. (*Healy* v. *Brewster, supra,* p. 464.)

Upon the retrial Brewster filed an amended cross-complaint which, by the sixth cause of action, alleged an executed oral modification of the contract. Judgment was rendered in favor of Brewster and against Healy and its surety in the sum of $67,038.70, plus $15,000 statutory attorneys fees. Healy appeals from this judgment.

### The Contentions

The appellants urge reversible error upon four principal

grounds which are more particularized by subheadings as follows:

"I. The trial court erred prejudicially to Healy in failing to find whether the County's disclaimer of warranty as to the condition of the soil inures to the benefit of Healy and is binding on Brewster, and in making conflicting findings on that subject.

"(1) It is prejudicial error to fail or refuse to find on issues material to the controversy.

"(2) The disclaimer of warranty was a part of the subcontract between Brewster and Healy.

"(3) Findings which are conflicting and irreconcilable require a reversal of the judgment.

"(4) The refusal to find whether the disclaimer of warranty inures to the benefit of Healy conflicts with the finding (par. XIX) that Healy made express and implied warranties with respect to the specifications and corings and conflicts with the finding (par. XX) that relief could be given on the basis of mutual mistake of fact.

"(5) Findings (par. XIX) speak of implied and express warranties with respect to the plans and specifications and the corings. No such theory is even hinted at in the pleadings.

"II. Brewster showed no circumstances which would have lawfully or rightfully entitled him to cease to perform the contract or to suspend its performance. Consequently there was no consideration for the alleged oral modification.

"III. There is no substantial evidence to support the findings of the trial court as listed in subheadings 2 to 7 of this point.

"(1) Findings of fact against the evidence or on insufficient evidence require a reversal of the judgment.

"(2) Measured by the contract of the parties there was no mistake; and since neither mistake nor misrepresentation is pleaded and, in fact, negatived by the reference in the findings to a mutual mistake, Brewster had no right to recover because of the difficult conditions encountered.

"(3) The evidence is insufficient to show an executed oral modification of the written contract between the parties.

"(a) There was no meeting of the minds on any new terms to be substituted for the old ones.

"(4) The fact that Brewster continued to do the work does not furnish consideration for the alleged modification.

"(5) The finding that there is an implied warranty that the plans and specifications were workable and an express

warranty that they were workable, correct and sufficient is unsupported by the evidence and erroneous if treated as a conclusion of law.

"(6) The finding that Brewster's inspection was reasonable is not supported by the evidence.

"(7) The court errerd in failing to find on the affirmative defenses of the defendant Healy.

"IV. The evidence does not sustain the finding and judgment that the reasonable value of the hardpan work was the sum of $67,038.70."

### The Law as Applied to the Facts

The trial court found, based upon substantial evidence, in findings XIII to XIX inclusive, that:

"The County-Healy contract incorporated, as Plans and Specifications, certain sheets showing logs and corings of soil (hereinafter called 'logs of corings') made at the Fox Airport site by personnel of the County of Los Angeles.

"The logs of corings furnished by the County of Los Angeles were defective and misleading insofar as they purported to describe the borrow pit subsoil to be used in the construction of the embankment as 'sand,' 'sandy loam,' or other such friable soil. Instead of such suitable material satisfactory for the construction of the embankment, the borrow pit contained unsatisfactory 'hardpan.'

"Healy exhibited to Brewster the Plans and Specifications, including the logs of corings, to induce Brewster to bid. Such Plans and Specifications induced Brewster to reasonably believe that the embankment could be constructed as described in such documents and that such description of the work to be done could be relied upon in making a bid.

"The Plans and Specifications showed the borrow pit subsoil conditions as they were supposed or believed by all the parties to exist—easily worked sandy loam type soil suitable for the embankment construction, and not material unsatisfactory for subgrade, such as 'hardpan.' The nature of the borrow pit soil was a material element of the Healy-Brewster written subcontract.

"Brewster's bid of 28½c/cu.yd. for the construction of the embankment with suitable material satisfactory for subgrade from the borrow pit was based upon his reasonable belief (shared by the County and Healy) that the borrow pit subsoil conditions indicated by the Plans and Specifications actually existed. Brewster's bid was much lower than he

would otherwise have made had he believed that the borrow pit subsoil was 'hardpan.'

"Under all the circumstances (including the parties' reasonable mutual belief as to the suitability of the borrow pit subsoil for embankment construction) Brewster's pre-bid site investigation was reasonable.

"The original Healy-Brewster contract which required Brewster to follow the Plans and Specifications constituted an implied warranty by Healy that such Plans and Specifications were workable, correct and sufficient; Healy's submission to Brewster of the logs of corings constitute an express warranty by Healy that such Plans and Specifications were workable, correct and sufficient."

A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being otherwise than as represented. (*E. H. Morrill Co.* v. *State of California,* 65 Cal.2d 787 [56 Cal.Rptr. 479, 423 P.2d 551]; *City of Salinas* v. *Souza & McCue Constr. Co.,* 66 Cal.2d 217, 222 [57 Cal. Rptr. 337, 424 P.2d 921].) This rule is based mainly upon the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. (*Souza & McCue Constr. Co.* v. *Superior Court,* 57 Cal.2d 508, 510 [20 Cal.Rptr. 634, 370 P.2d 338]; *United States* v. *Spearin,* 248 U.S. 132 [63 L.Ed. 166, 169, 39 S.Ct. 59]; *Montrose Contr. Co., Inc.* v. *County of Westchester* [2d Cir.], 80 F.2d 841, 842; Williston on Contracts [rev. ed. 1938] § 1966; *McCree & Co.* v. *State,* 253 Minn. 295 [91 N.W.2d 713].) The fact that the breach is fraudulent does not make the rule inapplicable. (*Jackson* v. *State,* 210 App.Div. 115 [205 N.Y.S. 658, 664] [affd. 241 N.Y. 563 [150 N.E. 556]]; *Hersey Gravel Co.* v. *State,* 305 Mich. 333 [9 N.W.2d 567, 569, 173 A.L.R. 302].)

The trial court found that "Healy and Brewster made and executed an oral agreement wherein and whereby plaintiffs agreed to pay to defendant the reasonable value of Brewster's services in connection with the unforeseen complications arising from the unanticipated 'hardpan' soil conditions" and that "Such oral agreement was supported by good and adequate consideration."

"Any benefit conferred, or agreed to be conferred, upon the

promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor, is a good consideration for a promise.'' (Civ. Code, § 1605.) ''An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise.'' (Civ. Code, § 1606.)

▆ The court also found upon substantial evidence that ''When the 'hardpan' was discovered, it revealed a mutual material mistake of the parties as to what would be required under the original contract.'' This mutual mistake, found to have been shared by the county and Healy, gave rise to the right of Healy to rescind the prime contract and the right of Brewster to rescind the subcontract. (Civ. Code, § 1689; *Van Meter* v. *Bent Constr. Co.*, 46 Cal.2d 588, 594 [297 P.2d 644].) ▆▆ It was also Brewster's contention that he was not required to process the unsuitable hardpan found in the borrow pits into suitable embankment fill. The evidence disclosed and the court found that Healy promised to pay Brewster the reasonable value of such extra hardpan work and Brewster relied upon such promise in forbearing rescission and in performing such hardpan work. Forbearance to make use of some legal remedy is sufficient consideration for a promise. Also forbearance to press a claim or a promise of such forbearance, may be a sufficient consideration even though the claim is wholly ill-founded. (1 Corbin on Contracts, §§ 139, 140, pp. 592, 595; *Pittsburgh Testing Laboratory* v. *Farnsworth & Chambers Co.* (10th Cir.) 251 F.2d 77, 79.) ▆ In cases where there is adequate consideration for the oral modification, and in which the party relying thereon has fully performed, the contract may be enforced as modified whether or not the other party has performed on his part. (*D. L. Godbey & Sons Constr. Co.* v. *Deane*, 39 Cal.2d 429, 433 [246 P.2d 946].)

The trial court found that ''Although the extra 'hardpan' work was done at the request and with the full knowledge of plaintiffs, neither party suggested compliance with Paragraph X of the written subcontract providing for a written change order or the necessity of an advance agreement or writing. The Court finds that such provision of Paragraph X of the

written subcontract was and is inapplicable to the parties' oral agreement covering 'hardpan' work, but that if such provision had any applicability, the parties, by their conduct, waived it.'' ▆ Where the terms of a written contract require that extra work be approved in writing, such provision may be altered or waived by an executed oral modification of the contract. (*MacIsaac & Menke Co.* v. *Cardox Corp.*, 193 Cal.App.2d 661, 670 [14 Cal.Rptr. 523] ; *Miller* v. *Brown*, 136 Cal.App.2d 763, 775 [289 P.2d 572].)

▆ The trial court found that "In the Court's view, it is unnecessary to the correct disposition of this case to decide whether Healy is entitled to the benefit of the County's attempted disclaimer of warranty as to the accuracy of the Plans and Specifications as a representation of actual soil conditions at the Airport site, since such a disclaimer would not preclude relief from either the mutual mistake of fact or the bilateral resolution of the 'hardpan' problem by a new executed oral agreement. However, the Court finds that Healy's warranty of the sufficiency of the Plans and Specifications is superior to the general disclaimer of warranty as to actual conditions.'' The disclaimer of the county did not, as a matter of law, insulate Healy against the right of Brewster to rescind the subcontract upon the ground of mutual mistake. (*E. H. Morrill Co.* v. *State of California, supra*, p. 791.) The foregoing finding bears upon the disclaimer of warranty contained in the County-Healy contract and was sufficient in the absence of a request for a more specific finding on the question (Code Civ. Proc., § 634), whch request was not made by the appellants.

The appellants' claims that there is no substantial evidence to support certain findings and that certain findings are against the evidence are without merit. Their claim that the trial court erred in failing to find on the affirmative defenses raised by Healy is likewise without merit. The answer to the amended cross-complaint contained three affirmative defenses. They were in substance (1) lack of consideration for the payment of any sum to Brewster other than was provided for in the written subcontract, (2) the sum of $96,524.76 admittedly paid to Brewster constituted full payment of all sums due to him under the terms of the contract, and (3) that the cross-complaint failed to state a cause of action. The trial court found ''. . . that each and all the allegations of plaintiffs and cross-defendants' First, Second and Third Affirmative Defenses are untrue, except the allegation in the Second Affirma-

tive Defense that defendant has been paid the sum of $96,524.76, which allegation is true.''

■ As to the plaintiffs' claims that the evidence does not sustain the finding and judgment that the reasonable value of the hardpan work was the sum of $67,038.70, the record discloses that one alternative theory of recovery was that the hardpan work was ''extra work'' under the terms of the subcontract, and the trial court concluded that such theory was available under the facts found. There was testimony on the part of Brewster as to the extra hours and equipment required to process the hardpan, over and above that which would have been required had the material encountered been sandy loam. One summary of costs received in evidence disclosed that the cost of the entire work performed, on an hourly basis, without profit, was the sum of $244,826.12. In the opinion of Gerald Eugene Brewster, as expressed in his testimony at the first trial and received in evidence at the second trial, the reasonable value of the equipment and man hours furnished upon the job was the sum of $279,461.87. Brewster was paid the sum of $96,524.96. Under these circumstances we are unable to see how the judgment awarding Brewster the additional sum of $67,038.70 for the reasonable value of the extra work found to have been performed by him is not supported by the evidence. ■ There is no requirement that the trial court set out either its computations, or the particular evidence upon which it may have relied in determining the amount of damages. Nor is an appellate court concerned with the weight of testimony, particularly with reference to the amount of damages. The pertinent inquiry is whether there was substantial support in the evidence for the finding as to damages, and the appellants have the burden of demonstrating that the determination as to the amount of damages was erroneous. (*City of Salinas* v. *Souza & McCue Constr. Co., supra,* pp. 224-225.)

The judgment is affirmed.

Kaus, P. J., and Stephens, J., concurred.

A petition for a rehearing was denied June 20, 1967, and appellants' petition for a hearing by the Supreme Court was denied July 26, 1967. Burke, J., did not participate therein.