[Civ. No. 8478. Fourth Dist., Div. One. Sept. 18, 1967.]

WILLIAMS CONSTRUCTION CO., Plaintiff and Respondent, v. STANDARD-PACIFIC CORP., Defendant and Appellant; SEACOAST SAVINGS AND LOAN ASSOCIATION et al., Defendants and Respondents; ADELE WALSH PARKER et al., Interveners and Respondents.

444

Roquemore & Mannheim and Thomas L. Roquemore for Defendant and Appellant.

Baker, Ancel & Redmond and Mark G. Ancel for Plaintiff and Respondent.

Richard D. Ring for Defendants and Respondents.

Fredman, Silverberg & Shenas and Peter Shenas for Interveners and Respondents.

LAZAR, J. pro tem.*—This case evolves from a unique and hurried real estate transaction not free from some complexity

*Assigned by the Chairman of the Judicial Council.

of concept and ambiguity of execution. Fortunately the beginning awesomeness of the litigation has resolved into manageable questions of slight number. The cause was tried to the court without a jury and appellant challenges the sufficiency of legally admissible evidence to support the findings. No request for special findings was made and all intendments are therefore in favor of upholding the judgment.

On December 21, 1963, defendant Seacoast Savings & Loan Association (Seacoast) and Interveners Mr. and Mrs. Parker (Parker) entered into a written agreement (Agreement) for the exchange of real properties. Mrs. Parker was an experienced lawyer and represented the interests of her husband and herself, as well as those of plaintiff Williams Construction Co. (Williams) a third party beneficiary of the Agreement. Seacoast was represented by its attorney, Thomas Roquemore, who was also an officer and director of Seacoast, as well as attorney for and an officer and director of defendant-appellant Standard-Pacific Corporation (Standard).

The Agreement provided for the exchange of the Parker property for a substantial number of ''repossessed'' properties owned by Seacoast which Seacoast wanted to dispose of by December 31, 1963. Seacoast obligated itself to lend to Parker 70 percent of the value of the properties transferred by it. Seacoast also obligated itself to sell the 2,000-acre ranch received by it from Parker to Williams for $700,000. Williams was to pay $35,000 in cash and secure the balance by a note for $665,000, secured by a first deed of trust on the ranch. The exchange and sale were each made contingent upon the completion of the escrow for the other. The note was to mature in two years; interest payable quarterly. The Agreement provided for a ''release clause'' in the deed of trust in units of not less than 40 acres with specified release prices per acre. ''Seacoast [agreed] that at the expiration of the [two-year] loan, and if Buyers [Williams Construction Co.] were not in default, to re-appraise said ranch and make the Buyers a new secured loan of at least 70% of the appraised value'' payable on an amortized basis over a substantial number of years. ''Except when indicated otherwise all deeds, promissory notes and deeds of trust shall be on standard forms of Seacoast.'' The Agreement as quoted below recognized that Seacoast was subject to regulatory agencies and provided for rescission by either party if Seacoast were unable to make the loans on the properties conveyed to the Parkers within the six months'

period from January 1, 1964. The Agreement was made binding upon and for the benefit of assignees of the parties. The exchange of property and sale of the ranch by Seacoast to Williams were consummated in accordance with the terms of the Agreement, except that a title company note form, upon request of Mrs. Parker, and with the consent of Seacoast was signed by Williams in substitution for the Seacoast note form.

Among the general provisions of the Agreement one is specially involved in this appeal and merits quotation at length, to-wit: ''3. It is understood that this entire agreement is subject to certain laws, rules and regulations of various regulatory authorities and this entire Agreement and SEACOAST's performance is subject to certain laws, rules and regulations of various regulatory authorities. In this connection SEACOAST has represented that it is presently able to perform this agreement under existing laws and regulations. However, the parties agree that should a regulatory authority declare a moratorium making it impossible for SEACOAST to complete the loans to PARKERS within the said 6 month period, there shall be a right for either party to rescind this Agreement.

''In the event of such rescission, SEACOAST agrees, in addition to restoring all other consideration received by it from the PARKERS and/or WILLIAMS CONSTRUCTION Co. to reimburse PARKERS and WILLIAMS CONSTRUCTION Co., on demand for any and all costs and expenses, except real estate commissions incurred in connection with the trade and sale escrows hereinabove referred to.''

Early in 1964, Seacoast was required by the state Savings and Loan Commissioner to dispose of the Williams note and deed of trust at par. Standard negotiated a loan from a bank, on April 4, 1964, acquired the Williams note and its security at par and deposited them with the lending bank as collateral security for the loan. By letter in August 1964, Roquemore notified Mrs. Parker that Seacoast had sold the note to Standard and that the note could not be ''renewed'' on December 31, 1965, as called for by the Agreement. Again, on September 13, 1964, Roquemore wrote Mrs. Parker that Standard could not ''renew'' the loan, ''and since Seacoast was forced to dispose of the loan it is my opinion that Standard-Pacific can rely upon paragraph (3) of the Agreement and take the position that since Seacoast could not renew this loan any successor would stand in its shoes.'' Mrs. Parker informed Roque-

more that his correspondence indicated an anticipatory breach of the Agreement by Standard and directed Williams to withhold further interest payments. On November 18, 1964, Roquemore wrote: ''This letter is to advise that the holder of the note stands ready, willing and able to live up to any obligations that are contained in the Agreement of December 21, 1963, and we expect Williams Construction Co. to live up to its obligations as provided in said Agreement and the note and trust deed executed in connection therewith.''

The first two quarterly interest payments were made; the third or September 30, 1964, interest payment was not made because of the correspondence above-mentioned. Based upon Roquemore's November 18 letter, Williams undertook to make the September 30 payment. The payment was refused because foreclosure proceedings had been commenced and reinstatement charges were demanded. As a result the subject litigation was commenced by Williams for a declaration of the rights of the parties.

Upon the trial the ultimate questions to be determined were: (1) Did the Williams' note properly include an acceleration clause for payment of the entire principal of the note if the property or any part of it were sold?; (2) Was Standard obligated to renegotiate the loan upon its maturity date (December 31, 1965) in accordance with the Agreement? The trial court answered the first question negatively and the second affirmatively, and defendant Standard appeals.

## DISCUSSION

1. *Is Standard obligated to make a new loan to Williams in accordance with provisions of the Agreement?*

No. Standard was not a party to the Agreement. It is true that there was an identity of attorney, officer and director between Seacoast and Standard but no contention is made that Standard has any responsibility as a party to the Agreement. If Standard has a responsibility to Williams it must arise either on an assignment of the Agreement to Standard and an assumption of Seacoast's liabilities, or by some act which, upon principles of estoppel, preclude Standard from denying that it is obligated to fulfill Seacoast's responsibilities.

No finding was made that the Agreement had been assigned to Standard or that Standard assumed Seacoast's liabilities under the Agreement. The findings do include a finding that Seacoast assigned to Standard the Williams' note and deed of

trust. No evidence was produced which would have justified a conclusion that the Agreement had in fact been assigned and a finding of that tenor would have been without support.

Finding No. 9 is that Standard at the time it acquired the note and deed of trust had complete knowledge of the Agreement and the negotiations leading to its execution. Finding No. 10 is that Standard "voluntarily accepted the rights and benefits to which [Seacoast] was entitled [by the Agreement]; and, while knowing all the obligations arising from said contract, did, in fact, exercise rights pursuant thereto and received benefits therefrom." Finding No. 12 is that Williams and Parker would not have made the quarterly interest payments after June 30, 1964, but for Roquemore's letter of November 18, 1964. Finding No. 13 we set out at length, as follows: "13. That by said letter of November 18, 1964, Standard-Pacific Corporation, by and through its agent, officer, and attorney, Thomas L. Roquemore, advised Williams Construction Co. and Ivon J. Parker and Adele Walsh Parker that Standard-Pacific Corporation was ready, willing and able to live up to any obligations of Seacoast Savings and Loan Association contained in the said contract executed on December 24, 1963; that by said letter Standard-Pacific Corporation, by and through its agent, officer, and attorney, Thomas L. Roquemore, impliedly represented and agreed that Standard-Pacific Corporation would make a new loan to Williams Construction Co., on December 31, 1965 as required in the aforesaid December 24, 1963 contract at page 6 thereof as follows: 'Seacoast agrees that at the expiration of the above loan, and if Buyers are not in default, to re-appraise said ranch and make the Buyers a new secured loan of at least 70% of the appraised value, payable as follows: 7% interest only on the principal sum for two years, payable monthly, thereafter principal and interest payable in monthly installments in an amount equal to 1% of the face amount of the note. If the Buyers are not satisfied with the Seacoast appraisal they may have the property appraised and if the two appraisals are not substantially equal in value, then a third appraiser agreed to by the parties shall appraise said ranch for the purpose of the new loan and which shall be binding on both parties.' "

By Finding No. 14 Williams and Parker were found to have suffered detriment in making five interest payments in reliance upon the matter set forth in Finding No. 13. Finding No. 16 is to the effect Standard is estopped "from denying its

acceptance of the rights and benefits'' of the Agreement and ''its obligation to make the new loan'' to Williams.

The finding that Standard knew all that there was to know about the making of the Agreement and the negotiations in advance thereof is eminently correct.

The next finding is that Standard voluntarily accepted the rights and benefits to which Seacoast was entitled by the Agreement and knowing the obligations of the Agreement exercised rights pursuant thereto and received benefits therefrom. This finding is not supported by the evidence. The evidence is that Standard purchased for its face value a secured note, negotiable in form. At that time, nothing remained to be done under the Agreement except a possible remaking of the Williams loan approximately two years hence. No rights or benefits remained to accrue to Seacoast because the Parker transaction had been completed and Seacoast had thus disposed of the numerous unwanted properties with which it was burdened. It is true that the Agreement remained executory insofar as it concerned Seacoast's obligation to provide individual loans on the properties transferred to the Parkers, but there is no contention that this responsibility devolved upon Standard except by subsequent events. The Williams note and deed of trust came into existence as a result of the Agreement, but they enjoyed an independent life as soon as they were created, neither dependent upon nor taking substance from the Agreement. Any rights and benefits which Standard acquired or enjoyed were expressed in the note and deed of trust, not upon the Agreement in any respect. Seacoast had no rights or benefits to transfer to Standard except as they were found in the Williams note and its security. We have been unable to find in the record anything to suggest that Standard exercised rights pursuant to the Agreement or received benefits from it. The evidence discloses only that Standard paid $665,000 for the asset acquired by it.

Standard's position with respect to the Agreement may easily be tested by supposing that the Williams note had been sold by Seacoast to someone who knew nothing of the Agreement. Surely it would not seriously be urged that the purchaser of the note had in some way benefited by the Agreement or had acquired obligations resulting from the Agree-

ment. We must hold that the mere knowledge possessed by Standard at the time of the assignment, there being no question of impairment in Seacoast's title to or right to transfer the note, in no way subjected Standard to collateral undertakings which the Agreement contained.

Parker and Williams rely upon Roquemore's letter of November 18, 1964, as the basis for an estoppel against Standard as set forth in Finding No. 13. In this connection it is necessary to consider Mrs. Parker's letter of November 12 to Roquemore and his reply of November 18.

Mrs. Parker said: "This will confirm our telephone conversation of today in which I advised you that there are two legitimate offers pending for the entire parcel owned by Williams Construction Co. and covered by the trust deed originally executed in favor of Seacoast Savings and Loan as beneficiary. One of the offers is contingent upon confirmation of the terms of the loan extension as set forth in Paragraph III (2) of the agreement executed December 21, 1963. As you know, it is our position that there is no provision in the agreement which permits Standard Pacific as the present owner and holder of the Williams Construction Company note to change the terms of such agreement. However, you have in effect created an anticipatory breach of such agreement by reason of the position taken in your recent letters.

". . . . . . . . . . . . .

"The interest payment has been deferred only because of the anticipatory breach, and as soon as the problem has been eliminated the current installment will be transmitted to you.

". . . . . . . . . . . . ."

Mr. Roquemore said:

". . . . . . . . . . . . .

"I know of no offers which you have to sell the real property in question except what you have told me. You state in your letter that you request a confirmation of the terms of the loan extension as set forth in Paragraph III (2) of the Agreement dated December 21, 1963. I respectfully submit that the Agreement speaks for itself and requires no confirmation by anyone. Your statement that Standard-Pacific or anyone else has made an anticipatory breach of the Agreement is hereby generally and specifically denied.

"The fact that you may be selling the property in my judgment has nothing to do with the Agreement and I will admit

it provided, in effect, that it is binding upon and benefits the transferees and assigns of the parties, however, there is one additional fact that I know you must be aware of otherwise you would not be asking Standard-Pacific to agree to enter into a new agreement with your proposed buyers, and that is the language contained in the Deed of Trust. This provision provides, in effect, that in the event of a sale of the real property by the owner thereof, etc., written consent of the beneficiary must be first obtained or the beneficiary has the option to demand the full unpaid balance of its note. I point this out for the reason that the holder of the note must, in any event, agree to accept a new buyer of the real property before any of the provisions of the aforesaid Agreement can be applicable.

''I was very surprised to learn that your payment owed by Williams Construction on October 1, 1964 had not been paid. It appears to me that Williams Construction is in a very difficult position in trying to claim an anticipatory breach of the Agreement so as to avoid the payments called for in the note.

''This letter is to advise that the holder of the note stands ready, willing and able to live up to any obligations that are contained in the Agreement of December 21, 1963 and we expect Williams Construction Co. to live up to its obligations as provided in said Agreement and the note and Trust Deed executed in connection therewith. You are very badly mistaken when you state that Standard-Pacific is, in any manner, trying to change the terms of the said Agreement or the note and Trust Deed executed by Williams Construction Co. It is my suggestion that you pay the interest payment immediately because Standard-Pacific has already stated its intentions to foreclose.''

We acknowledge the rule that the meaning of a document is for the trial court unless it is clear and unambiguous in which case its construction becomes a matter of law. In the face, however, of a contention that a finding of promissory estoppel is unsupported by the evidence the question of clarity and ambiguity of the November 18 letter must be examined in its entirety and in the context in which it was written. Bearing in mind that the correspondence involved was passing between two lawyers arguing with each other. it is noteworthy that Roquemore specifically informed Mrs. Parker that the Agreement spoke for itself and that no

452

confirmation was required in the respects she had requested. The claim of "anticipatory breach" by Standard was specifically denied in response to Mrs. Parker's reference to the earlier letter stating Standard would not make the loan called for in December 1965. We have not set out all of the series of letters between the two lawyers which started in August and ended with the letter of November 18, 1964, but it is clear that they were at all times adversary and, whether with reference to their overall effect or the wording of the November 18 letter alone, justified no sense of capitulation upon the part of Standard. We find no basis upon which Roquemore's correspondence can be construed to mean anything but that the situation is as it is and Williams defaults in its quarterly interest payment at its peril.

While we find no difficulty in holding the correspondence subject to one construction only, namely, that a promissory estoppel was not expressed, we call attention to the suggestion in *Brichetto* v. *Raney,* 76 Cal.App. 232, 263 [245 P. 235] that a plea of estoppel should be recognized only if based upon highly certain evidence, and also, "where one acts with full knowledge of plain provisions of law, and their probable effect upon facts within his knowledge, especially where represented by counsel, he can neither claim (1) ignorance of the true facts, or (2) reliance to his detriment upon conduct of the person claimed to be estopped, two of the essential elements of equitable estoppel [citing cases]." (*Joseph George, Distributor* v. *Department of Alcoholic Beverage Control,* 149 Cal.App.2d 702, 712-713 [308 P.2d 773].)

If on the other hand we were to consider that the letter of November 18 were properly subject to an inference that the December 1965 loan would be made, the case then comes within the rules laid down in *Healy* v. *Brewster,* 59 Cal.2d 455, 463 [30 Cal.Rptr. 129, 380 P.2d 817], where it was said: "The doctrine of promissory estoppel is inapplicable where the promisee's performance was requested by the promisor at the time the promise was made. [Citation.]

"Under such circumstances, the only reliance which can make the promisor's failure to perform actionable is the promisee's doing what was requested. If that reliance was detrimental, it would constitute consideration. If it was not detrimental, it would not constitute consideration; and since detrimental reliance is an essential feature of promissory

estoppel, that doctrine could not be invoked to make the promisor liable. [Citations.]

"In other words, where the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel."

■ In the framework of the instant case, Standard's promise to make the loan was tendered in exchange for Williams' payment of the past due quarterly interest required by the note. The payment of that interest payment, and subsequent ones, however, was already a legal obligation of Williams and thus afforded no consideration for Standard's promise. (See 1 Witkin, Summary of Cal. Law (1960) Contracts, § 79, pp. 84-85; 12 Cal.Jur.2d Contracts, § 40, pp. 237-239.) Finding 13 is in this view without support in the evidence.

With reference to the foregoing discussion we consider it advisable to refer to certain statements made in Parker's brief. It is stated by them in relation to the requirement by the Savings and Loan Commissioner that Seacoast dispose of the Williams note, that "Under the terms of the agreement above set forth, Seacoast had only one possible remedy available to it—rescission. Yet it is undisputed that no effort was ever made by Seacoast to avail itself of such remedy." Examination of the Agreement will disclose that the remedy of rescission related only to an inability, by virtue of regulatory action, to complete the long term loans on the individual properties transferred to the Parkers as provided in Part IV, Loan Escrow Provisions of the Agreement. No issue appears in the case with respect to performance of those obligations by Seacoast.

2. *Are Williams and Parkers entitled to reformation of the Williams deed of trust to exclude the clause accelerating payment of the note upon sale of the encumbered property?*

Standard contends that the trial court's finding that the acceleration clause contained in the deed of trust was included by mutual mistake of the parties was not supported by the evidence. Insofar as the negotiations are concerned it is beyond cavil that the contents of the deed of trust were not discussed. The Agreement, as a written document, however, clearly specifies that Seacoast forms should be used. An executed modification of that understanding occurred

when the Williams note was written on a different note form, modified and agreed to by the parties.

 A contract may validly include the provisions of a document not physically a part of the basic contract. As stated in *Scott's Valley Fruit Exchange* v. *Growers Refrigeration Co.*, 81 Cal.App.2d 437, at p. 447 [184 P.2d 183]: (Disapproved on an inapplicable point in *Hischemoeller* v. *National Ice etc. Storage Co.*, 46 Cal.2d 318, 328 [294 P.2d 433].) ''It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties.''

It is true that a conflict developed as to whether Mrs. Parker had in her possession that portion of the deed of trust which contained the acceleration clause, but it would be utterly unrealistic to accept the proposition that a failure to know what was in the deed of trust was anyone's responsibility and fault but her own, and most certainly the form of deed of trust was readily available to her.

 We are not here concerned with a true case of reformation in which the right to relief is based upon a failure of a written contract to express the agreement which had been reached. Here the written agreement was the prime concern, with no discussion or expression by either negotiating party of the particular point which was included in the written document. The question with which the court is concerned is in fact the interpretation of the contract and whether it can be given reasonable effect as written. We hold that it can.

 An inconsistency appears to exist between the acceleration clause in its standard form as a part of the printed and recorded condition of the deed of trust and the release clause provision specifically and intentionally added to the deed of trust. The inconsistency arises because of the standard form language providing for acceleration in the event of sale of ''any part'' of the encumbered property. If the condition relating to ''any part'' is deemed modified and held inappli-

cable to "parts" controlled by the particular provisions of the release clause, as required by well known rules of construction, the inconsistency is dissolved, the provisions reconciled. We hold this to be the proper construction of the subject deed of trust.

In view of the conclusions which we have expressed it becomes unnecessary to consider Standard's assignments of error with respect to the admission of various documents into evidence.

In view of the limited issues presented to the trial court by the parties and the consequent limited determination the court below could appropriately make in its judgment, we are not called upon to decide whether there are available to respondents equitable defenses to the enforcement of the note and deed of trust notwithstanding Standard is not affirmatively obligated upon the Agreement. (Cf. *Bliss* v. *California Cooperative Producers,* 30 Cal.2d 240 [181 P.2d 369, 170 A.L.R. 1009].)

The judgment is reversed.

Brown (Gerald), P. J., and Whelan, J., concurred.