**In re DAVIS PETROLEUM CORP. and Davis Offshore Holdings LLC and Davis Petroleum Corp., et al, Debtor(s).**

**No. 06–20152.**

United States Bankruptcy Court, S.D. Texas, Corpus Christi Division.

Nov. 13, 2009.

Rhett G. Campbell, Mitchell A. Ayer, Robert L. Paddock, Mathew R. Reed, Thompson & Knight, LLP, Houston, TX, for Albert S. Conley, Liquidating Trustee.

William R. Greendyke, Johnathan C. Bolton, Fulbright & Jaworski LLP, Houston, TX, for Red Mountain Capital Partners LLC.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING TRUSTEE'S OBJECTION TO RED MOUNTAIN CAPITAL PARTNERS LLC'S THIRD AMENDED AND RESTATED CLAIM NO. 29 AND ORDER

RICHARD S. SCHMIDT, Bankruptcy Judge.

On September 2, 2009, the Court held a hearing (the "Claim Objection Hearing") in order to consider the Objection (the "Objection") filed by Albert S. Conly, as Liquidating Trustee (the "Trustee") of the DPC Liquidating Trust (the "Liquidating Trust"), to Red Mountain Capital Partners LLC's ("Red Mountain") Third Amended and Restated Claim No. 29 (the "Proof of Claim" or "Claim"). The Court, having heard the evidence and arguments of counsel, and having reviewed the pleadings and briefs on file herein, makes the following findings of fact and conclusions of law (the "Findings and Conclusions") in support of its Order Sustaining Objections to Red Mountain's Claims (the "Order").

### JURISDICTION AND VENUE

1. The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter concerns the allowance or disallowance of claims; therefore, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

2. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### I. FINDINGS OF FACT

3. The following record (the "Record") was established to support this Court's entry of the Order sustaining the Trustee's Objection to Red Mountain's Claim:

a. The Joint Submission of Undisputed Facts and Exhibits (the "Joint Stipulation") [Dkt. No. 766], including the exhibits referenced therein and attached thereto, each of which were admitted into evidence;

b. All documents identified on the Trustee's Exhibit List filed on September 2, 2009 [Dkt. No. 774], and which were admitted into evidence as identified therein;

c. All documents identified on Red Mountain's First Amended Witness and Exhibit List filed on September 2, 2009 [Dkt. No. 776], and which were admitted into evidence as identified therein;

d. The proffer and testimony at the Claim Objection Hearing of Will Mesdag, a principal and founding member of the investment firm of Red Mountain;

e. The proffered testimony at the Claim Objection Hearing of William R. Greendyke, a partner with the law firm of Fulbright & Jaworski L.L.P. ("Fulbright");

f. Red Mountain's designation of the testimony by deposition at the Claim Objection Hearing of Gregg Davis, the former President of Davis Petroleum Corporation [Red Mountain Exhibit 35];

g. Red Mountain's designation of the testimony by deposition at the Claim Objection Hearing of Dan Armel, the former independent director of Davis Petroleum Corporation [Red Mountain Exhibit 37];

h. The entire record of the Debtors' chapter 11 cases (the "Bankruptcy Cases") and their respective dockets as maintained by the Clerk of the Bankruptcy Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and evidence and argument made, proffered, or adduced at the hearings held before the Court during the pendency of these Bankruptcy Cases, as to all of which the Court takes judicial notice for purposes of the Claim Objection Hearing; and

i. The evidence that was admitted into the Record in connection with Red Mountain's Claim and the Trustee's Objection.

4. Upon consideration of the foregoing Record, the Court finds and concludes that the evidence presented at the Claim Objection Hearing amply supports, by a preponderance of the evidence, the Trustee's Objection to Red Mountain's Proof of Claim and that the Trustee's Objection should be sustained.

5. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

## II. FACTUAL AND PROCEDURAL BACKGROUND

6. Following Marvin Davis's death in September 2004, the Davis family members, which included Barbara Davis, Patricia Davis Raynes, John Davis, Dana Davis, Nancy Davis and Gregg Davis (exclusive of Gregg Davis, the "Davis Family," and with Gregg Davis, the "DPC Shareholders"), each engaged counsel to represent their interests in connection with matters relating to distributing the Marvin Davis estate and handling its major assets, including Davis Petroleum Corporation ("DPC").[1]

7. In the fall of 2004, DPC needed additional capital and liquidity, and certain members of the Davis Family expressed an interest in selling some or all of their equity interests in DPC.[2]

8. Gregg Davis, President of DPC, approached Will Mesdag in the fall of 2004 and proposed to seek permanent capital through a management led buyout.[3]

9. Gregg Davis, DPC, and Red Mountain entered into an investment advisory services agreement dated January 31, 2005 (the "Letter Agreement").[4] Pursuant to the Letter Agreement, Red Mountain was retained to advise Gregg Davis and Davis Acquisition Corp. ("DAC") in connection with a potential management-led buyout of DPC, and to provide advisory services to DPC in negotiating bridge financing from Sankaty Advisors, LLC ("Sankaty") or another lender.[5]

---

1. Proffer of Willem Mesdag at ¶ 11 [Dkt. No. 773] (hereinafter, the "Mesdag Proffer").

2. *Id.* at ¶ 12.

3. *Id.* at ¶ 13.

4. *Id.* at ¶ 14; Joint Stipulation at ¶ 2.

5. Joint Exhibit 1.

10. Under the Letter Agreement, Red Mountain agreed to serve as an advisor for Gregg Davis and DAC (and only these parties) in connection with the possible "management led buyout" of DPC (the "Management Led Buyout").[6] In addition to a $10,000 monthly fee, Red Mountain was entitled to a success fee (the "Success Fee") to be paid by DAC upon consummation of the Management Led Buyout equal to the greater of $250,000 or 0.5% of the new capital raised to complete the Management Led Buyout (but not to include capital that is used to purchase shares from the Davis family).

11. The Letter Agreement also contained a guaranty by DPC. Importantly, the second full paragraph of the first page of the Letter Agreement provides that "[i]mmediately upon consummation of the [Management Led Buyout], you [Gregg Davis] shall cause the Company [DAC] to assume the obligations of DPC hereunder pursuant to a written agreement" (the *"DAC Assumption"*).[7] "Hereunder" means later in this document or in accordance with this document.[8] Thus, all of DPC's obligations under the Letter Agreement—guarantees and indemnities—were to be assumed by DAC pursuant to a written agreement. However, DAC was never formed and the DAC Assumption never occurred. The Letter Agreement was signed by Gregg Davis, individually and as President of DPC.[9]

12. Will Mesdag, a principal of Red Mountain and former practicing attorney, drafted the Letter Agreement.[10]

13. Gregg Davis did not form DAC nor was any similarly named company formed by Gregg Davis as required under the Letter Agreement.

14. Red Mountain provided advisory services to Gregg Davis and to DPC for ten months under the Letter Agreement.[11] DPC paid Red Mountain for its monthly advisory fees and reimbursed its expenses from January 2005 through October 2005.[12]

15. On October 26, 2005, DPC entered into an exclusivity agreement (the "Exclusivity Agreement") with Evercore to negotiate exclusively the terms of the Evercore Transaction subject to further due diligence, definitive documentation and shareholder approval.

16. As of the date of the execution of the Exclusivity Agreement, Red Mountain chose to become, along with Evercore, one of the potential buyers of DPC. Because of this conflict of interest, Red Mountain stopped providing advisory services to DPC as of October 26, 2005.[13]

17. At his deposition, Mesdag testified that the reason Red Mountain stopped performing services in October 2005 was because it had a conflict of interest when it moved to the buyer's side.[14] At trial, Mesdag testified, contrary to his deposition, that the reason Red Mountain stopped performing services under the Letter Agreement primarily because it had completed his work.[15] The Court finds that Mesdag's trial testimony not credible and finds that the reason Red Mountain ceased

6. *Id.*

7. Joint Exhibit 1.

8. BLACK'S LAW DICTIONARY 745 (8th ed.2004).

9. Joint Stipulation at ¶ 3.

10. Transcript at p. 21:13–16.

11. Transcript at p. 90:23–25 and p. 91:1–7.

12. *Id.*

13. Transcript 36:23–39:18.

14. *Id.*

15. *Id.*

performing services for DPC under the Letter Agreement in October 2005 was because Mesdag knew there would be a conflict if Red Mountain were on both sides of the proposed transaction.

18. The Evercore Transaction did not close in February 2006 as originally scheduled because DPC was not able to secure 100% shareholder approval.[16] DPC subsequently agreed with Evercore to consummate another transaction in connection with a prepackaged plan of reorganization.[17]

19. On March 7, 2006, the Debtors voluntarily filed for chapter 11 bankruptcy. On March 10, 2006, the Debtors confirmed the Debtors' Joint Plan of Reorganization (the *"Plan"*) and the Trustee was appointed under the Plan.

20. The Plan incorporated by reference that certain Purchase and Sale Agreement dated March 7, 2006, by and among Davis Petroleum Acquisition Corp. ("DPAC"), and Davis Offshore Partners LLC, as Buyers (*"Buyers"*) and Davis Petroleum Corp., Davis Offshore, L.P., and Davis Petroleum Pipeline LLC, as Companies (*"PSA"*), by which the equity of the Debtors, as reorganized, was sold to the Buyers. The Plan was consummated on March 31, 2006, on which date the PSA was closed (the *"Closed Transaction"*), the purchase price was paid, and the equity of the Debtors was transferred to the Buyers. Pursuant to the PSA, the equity of all three Debtors was sold to DPAC and Davis Offshore Partners LLC, entities formed by third-party investors. A Red

Mountain affiliate, RMCP, was one of the third-party investors.

21. Gregg Davis did not form DPAC.

22. At the closing of the PSA, Red Mountain alleged that the Closed Transaction was the Management Led Buyout and DPAC was DAC for purposes of the Letter Agreement, and that it is owed $800,000.00 as the Success Fee. Red Mountain sought to recover the Success Fee from DPAC.[18] DPAC responded that it was not a party to the Letter Agreement and had no obligation to pay the Success Fee.[19] DPAC, however, eventually agreed to settle Red Mountain's claim for $300,000 on the condition that its contribution would be credited against DPC's obligation to pay the Success Fee and that it be provided a release.[20]

23. Red Mountain agreed to accept the $300,000 settlement from DPAC.[21] As part of that agreement, Red Mountain released DPAC from any liability under the Letter Agreement. Red Mountain did not send an invoice for the Success Fee to DPC until March 28, 2006.[22]

24. At the March 31, 2006 closing of the Closed Transaction under the Plan, the Trustee declined to pay Red Mountain the balance of the Success Fee.[23]

25. On April 20, 2006, Red Mountain filed Claim No. 29 as a general unsecured claim, which was last amended on February 18, 2009, when Red Mountain filed its Third Amended and Restated Proof of Claim (the *"Third Amended Proof of Claim"*). In the Third Amended Proof of Claim, Red Mountain alleges that DPC

---

16. Mesdag Proffer at ¶ 39.

17. Red Mountain Exhibit 5.

18. Mesdag Proffer at ¶ 47.

19. *Id.* at ¶ 48.

20. *Id.* at ¶ 48; Red Mountain Exhibit 12.

21. Mesdag Proffer at ¶ 49; Red Mountain Exhibit 12.

22. Red Mountain Exhibit 13.

23. Mesdag Proffer at ¶ 51.

owes Red Mountain $500,000.00 as the remainder of the Success Fee plus indemnity claims for at least $819,172.

26. The Closed Transaction differed from the Original Evercore Transaction in that the transaction approved by this Court was contingent upon DPC filing bankruptcy and that (i) the sellers assumed all liabilities of DPC (which substantially reduced the shareholders' equity value) and (ii) 100% shareholder approval was not required.

27. The Closed Transaction was not a management led buyout, as the Letter Agreement required in order for Red Mountain to recover its Success Fee.

28. On June 16, 2006, the Trustee filed his Objection to Red Mountain's original Proof of Claim No. 29.[24] Red Mountain responded on July 6, 2006.[25]

29. On September 21, 2006, the Trustee filed his Amended Objection to Red Mountain's Amended and Restated Claim No. 29.[26] Red Mountain filed its response on October 11, 2006.[27]

30. On October, 19, 2006, the Court entered a Stipulation and Agreed Order to Abate Proceeding Concerning the Liquidating Trustee's Objection to Red Mountain's Claim (the "Abatement Stipulation").[28]

31. On November 14, 2008, the Trustee filed his objection to Red Mountain's Second Amended and Restated Claim No. 29.[29] Red Mountain responded on December 6, 2008.[30]

32. On June 11, 2009, the Trustee filed his objection to Red Mountain's Third Amended Claim No. 29.[31] Red Mountain responded on July 6, 2009.[32]

33. On September 1, 2009, the Parties filed the Joint Stipulation.[33]

34. Also on September 1, 2009, the Trustee filed a Memorandum of Law in Support of his Objection to Red Mountain's Third Amended and Restated Claim No. 29 (the "Trustee's Memorandum").[34]

35. On September 2, 2009, this Court held a hearing on the Trustee's objection to Red Mountain's Claim.

36. On September 16, 2009, the Trustee filed a Post–Hearing Brief in Support of his Objection to Red Mountain's Third Amended and Restated Claim No. 29.[35] Also on September 16, 2009, Red Mountain filed its Response to the Trustee's Memorandum.[36] On September 23, 2009, Red Mountain filed its Response to the Trustee's PostHearing Brief.[37] On October 2, 2009, the Trustee filed his Reply Brief to Red Mountain's Response.[38] On October 9, 2009, Red Mountain filed its Sur–Reply in Response to Trustee's Reply.[39]

24. Dkt. No. 183.

25. Dkt. No. 201.

26. Dkt. No. 283.

27. Dkt. No. 317.

28. Dkt. No. 323; Joint Stipulation at ¶ 44.

29. Dkt. No. 612.

30. Dkt. No. 626.

31. Dkt. No. 707.

32. Dkt. No. 724.

33. Dkt. No. 766.

34. Dkt. No. 767.

35. Dkt. No. 785.

36. Dkt. No. 786.

37. Dkt. No. 790.

38. Dkt. No. 797.

39. Dkt. No. 798.

37. Pursuant to the Joint Stipulation, the Parties stipulated and agreed to the admissibility of the exhibits attached thereto and marked as Joint Exhibits 1 through 19 and 22 through 28 (the "Joint Exhibits"). The Parties also agreed that since Joint Exhibits 15–19, 22, 23, and 25–27 are pleadings and orders of the Court, those exhibits were admitted only for the purposes of showing that they were actually filed or entered on the docket. Those exhibits were not admitted for the truth of the matter asserted in those pleadings and orders.

38. At the Claim Objection Hearing, the Court also admitted Trustee Exhibits 1 through 14 (the "Trustee Exhibits"),[40] and Red Mountain Exhibits 1 through 53 (the "Red Mountain Exhibits", and collectively with the Joint Exhibits and the Trustee Exhibits, the "Exhibits").

39. The foregoing Exhibits support the Findings and Conclusions herein made.

## III. *CONCLUSIONS OF LAW*

### A. The Letter Agreement.

40. The Letter Agreement is expressly governed by and to be construed in accordance with the laws of the State of California.

■ 41. Because Mesdag drafted the Letter Agreement, any ambiguity or uncertainty in the Letter Agreement must be construed against Red Mountain.[41]

■ 42. DPC is a surety under California law because it promised to answer for the debt or default of another under the Letter Agreement.[42] A surety is exonerated from liability if the principal obligor's liability ceases.[43] Thus, a creditor's full release of the principal is an action by the creditor that causes the principal's liability to cease within the meaning of California Civil Code section 2810, resulting in the exoneration of the surety (unless the surety knew of the release and agreed to assume liability).[44]

■ 43. In addition, a surety is exonerated if the creditor materially alters the original obligation of the principal in any respect or impairs or suspends the creditor's remedies or rights against the principal, unless the surety consents or is indemnified by the principal.[45] This is the

---

**40.** Trustee Exhibit 15, the Proffer of Albert Conly, was withdrawn by the Trustee at the Claim Objection hearing. Thus, the Court does not have Trustee Exhibit 15 before it and did not consider it in making of these Findings and Conclusions.

**41.** CAL. CIV.CODE § 1654; *Federal Nat'l Mortgage Ass'n v. Bugna*, 57 Cal.App.4th 529, 67 Cal.Rptr.2d 233, 236 (1997) (ambiguities are construed against the drafter of the instrument).

**42.** CAL. CIV.CODE § 2787 (nullifying the distinction between "sureties" and "guarantors" and defining a surety or guarantor as "one who promises to answer for the debt, default, or miscarriage of another").

**43.** *Id.* § 2810.

**44.** *R.P. Richards, Inc. v. Chartered Constr. Corp.*, 83 Cal.App.4th 146, 99 Cal.Rptr.2d 425, 431 (2000).

**45.** *Id.* § 2819. Section 2819 is expressly subject to section 2822(b), which provides that a creditor's acceptance of a partial payment, without the prior consent of the surety and *without any other change* to the agreement between the creditor and principal debtor, does not exonerate the surety for the lesser sum agreed upon by the creditor and principal debtor. *See* CAL. CIV.CODE § 2822(b). By its terms, section 2822(b) does not apply in cases where the creditor accepts a sum less than the entire balance owed in *complete* satisfaction of the principal obligation. Red Mountain accepted from DPAC a sum less than the entire balance of the "success fee" that Red Mountain claimed it was owed from DPAC in *full* satisfaction of its claim against

rule regardless of whether the alteration or impairment of the creditor's rights against the principal benefits or prejudices the surety.[46] A creditor's full release of the principal extinguishes the principal's obligation and impairs the creditor's rights and remedies against the principal within the meaning of section 2819, resulting in the exoneration of the surety.[47]

■■■ 44. DAC was never formed. DPAC is not DAC. The Closed Transaction was not the Management Led Buyout. For these reasons, Red Mountain's claim fails on the plain meaning of the Letter Agreement. Even assuming, *arguendo,* that DPAC is DAC and the Closed Transaction is the Management Led Buyout, Red Mountain's claim must fail because Red Mountain (as the creditor) accepted $300,000.00 in full satisfaction of its claims under the Letter Agreement against DPAC (as the principal). In other words, Red Mountain fully released DPAC with respect to its claims under the Letter Agreement. As a result, Red Mountain's rights and remedies against DPAC were impaired within the meaning of section 2819, resulting in the exoneration of DPC.

45. DPAC's liability ceased within the meaning of section 2810, resulting in the exoneration of DPC. And, although the settlement agreement purports to allow DPC a "credit" from the $300,000.00 paid by DPAC to Red Mountain, DPC was not a party to the settlement agreement, did not consent to the settlement agreement, and did not knowingly assume any liability thereafter.

46. Accordingly, upon Red Mountain's acceptance of the $300,000.00 from DPAC, DPC, and therefore, the Trustee, was exonerated from any liability to pay any part of the Success Fee or any other obligation under the Letter Agreement. This result fits squarely within the policy behind sections 2810 and 2819, that a creditor must not impair a surety's remedies against the principal.[48] Sections 2810 and 2819 serve to release the surety whose rights against the principal are impaired.[49] A surety's subrogation rights against the principal are impaired by the creditor when the creditor gives the principal a full release.[50] Because the creditor released its rights, the surety succeeds to nothing; the surety has no rights or remedies against the settling principal.[51]

47. Red Mountain fully released DPAC. If the Trustee were to pay Red Mountain's claim (assuming the Success Fee is actually owed), the Trustee would succeed to nothing. Thus, California Civil Code sections 2810 and 2819, and the policy behind such statutes, compels the result that the Trust is exonerated from any liability with respect to the Letter Agreement.

**B. Oral Amendment of Letter Agreement fails under the Statute of Frauds**

■■■ 48. Although not raised by Mesdag at the hearing on the Trustee's

---

DPAC. Therefore, section 2822(b) does not apply in this case. And, even assuming it did, section 2810, which, by itself exonerates DPC, is not subject to section 2822(b).

**46.** *Laskey v. Bew,* 22 Cal.App. 393, 134 P. 358, 360 (1913).

**47.** *R.P. Richards, Inc.,* 99 Cal.Rptr.2d at 431; *Bennett v. Leatherby,* 3 Cal.App.4th 449, 4 Cal.Rptr.2d 340, 343 (1992).

**48.** *See, e.g., Bennett,* 4 Cal.Rptr.2d at 342.

**49.** *Id.*

**50.** *Id.* at 343.

**51.** *Id.*

Objection, in Red Mountain's Third Amended Proof of Claim it alleged that Mesdag and Gregg Davis orally agreed to modify the Letter Agreement to make DPC primarily liable for all obligations thereunder. Under the California statute of frauds,[52] a promise or agreement to answer for the debt, default, or miscarriage of another person, such as a guaranty or surety, must be in writing and signed by the party to be charged. An oral modification of a contract subject to the statute of frauds is never permitted when it would materially alter the parties' written agreement.[53] "Were it possible to make an oral modification of a contract which by the statute of frauds is required to be in writing and enforce such oral modification, the door would be open for the perpetration of such frauds as the statute seeks to prevent."[54]

■■■ 49. Red Mountain alleges that Gregg Davis made certain oral statements which had the effect of amending the Letter Agreement. Even assuming, *arguendo*, that Gregg Davis made such statements, such oral statements are unenforceable as a matter of law. The alleged oral modifications to the Letter Agreement asserted by Red Mountain materially alter the substance of the Letter Agreement as written.

50. Red Mountain also argues that Greg Davis orally stated that DPC was to benefit from Red Mountain's services. But the Letter Agreement states that DPC is not a client of Red Mountain, and Red Mountain's services were to be performed solely for the benefit of Gregg Davis and DAC rather than DPC.

51. Red Mountain argues that Greg Davis orally stated that DPC will be primarily liable for the Success Fee. But, again, the Letter Agreement states that DPC is only a guarantor, and that DAC is to assume DPC's obligations under the Letter Agreement.

52. Therefore, the alleged oral amendments to the Letter Agreement that Red Mountain alleges Gregg Davis made are unenforceable as a matter of law.

## C. Red Mountain's Cessation of Services in October 2005 Excused DPC From Its Obligations Under the Letter Agreement

■■■ 53. Red Mountain argues it is entitled to the Success Fee even though it stopped performing advisory services in October 2005. But the Letter Agreement does not provide that Red Mountain is to be paid the Success Fee if Red Mountain stops performing advisory services before consummation of the Management Led Buyout and becomes a buyer-investor. The Letter Agreement states that Red Mountain is an advisor "in connection with" the Management Led Buyout, and that Red Mountain is to be paid the Success Fee "upon consummation" of the Management Led Buyout. Even assuming, *arguendo*, that the Closed Transaction is the Management Led Buyout, Red Mountain was not providing advisory services *in connection with* the Management Led Buyout upon consummation of such transaction.

■■■ 54. If one party to a contract commits a material breach, the other party is discharged or excused from further performance.[55] Whether a party's nonper-

---

**52.** Cal. Civ.Code §§ 1624, 2793.

**53.** *Id.* § 2819.

**54.** *Boyd v. Big Three Ranch Co.*, 22 Cal.App. 108, 133 P. 623, 624 (1913).

**55.** *See Crofoot Lumber, Inc. v. Thompson*, 163 Cal.App.2d 324, 329 P.2d 302, 308 (1958).

formance is a material breach depends upon whether the party failed to perform some minor part of his duty or whether the party failed to perform a duty that goes to the essence of the agreement.[56]

55. Under any reasonable interpretation of the Letter Agreement, the essence of Red Mountain's duties under the Letter Agreement included the rendition of advisory services in connection with the Management Led Buyout. Red Mountain's incentive to provide advisory services on an ongoing basis was its monthly fee of $10,000. Red Mountain's incentive to provide advisory services such that the Management Led Buyout closed or was consummated was the Success Fee. An interpretation that Red Mountain can collect the Success Fee after it has stopped performing services, switched sides, and does not close until approximately six months later is not consistent with the Letter Agreement.

56. It is undisputed that Red Mountain stopped performing advisory services in October 2005. The Closed Transaction was consummated in March 2006. Assuming, *arguendo*, that the Closed Transaction was the Management Led Buyout, Red Mountain's nonperformance went to the essence—the heart—of the Letter Agreement. Therefore, Red Mountain's cessation of services was a material breach that discharged or excused DPC from its obligations under the Letter Agreement.

**D. DPC is Not Responsible for the Success Fee Because DAC Never Assumed DPC's Obligations Under the Letter Agreement**

■■■ 57. The fundamental goal of contract interpretation is to give effect to

the mutual intention of the parties, and if contractual language is clear and explicit, it governs.[57] The words of a contract are to be understood in their ordinary and popular sense.[58] A condition precedent is one which is to be performed before some right dependent thereon accrues, or some act dependent thereon is performed.[59]

■■■ 58. The Letter Agreement states that immediately upon consummation of the Management Led Buyout, Gregg Davis shall cause the DAC Assumption, which is to say that Gregg Davis "shall cause [DAC] to assume the obligations of DPC hereunder pursuant to a written agreement." Further, upon consummation of the Management Led Buyout, DAC must pay the Success Fee to Red Mountain.

59. The plain language of the Letter Agreement shows that the parties never intended for DPC to be responsible for paying the Success Fee to Red Mountain. It is true that DPC agreed to guaranty Red Mountain's fees. But the plain language and structure of the Letter Agreement requires an act to be performed—a condition precedent satisfied—before Red Mountain is entitled to the Success Fee. That act was the DAC Assumption. But DAC was never formed. And the DAC Assumption never occurred. DPAC is not DAC, and DPAC was not formed by Gregg Davis. The Closed Transaction was not led by the management of DPC on the Buyer side. Even assuming, *arguendo*, that the Closed Transaction was the Management Led Buyout, Red Mountain's claim for the Success Fee must fail because the DAC Assumption never occurred.

**56.** *Crofoot,* 329 P.2d at 308.

**57.** *Renwick v. Bennett (In re Bennett),* 298 F.3d 1059, 1064 (9th Cir.2002) (applying California law).

**58.** CAL. CIV.CODE § 1644.

**59.** CAL. CIV.CODE § 1436.

**E. There is no "course of performance" in connection with a success fee.**

60. There is no "course of performance" as to paying success fees as no previous success fees were paid by the Trustee. Although Dan Armel tentatively agreed to pay $300,000 of Red Mountain's fees as a closing cost in connection with a transaction that would pay the Davis family $75 million, that transaction did not close. Red Mountain overstates Armel's position with respect to Red Mountain's entitlement to fees. There is no testimony that Armel recognized and agreed that DPC was unconditionally obligated to pay Red Mountain's fees. Also, Armel agreed to pay half of the fees before Red Mountain, as part of the Buyer Group, negotiated the price to shareholders down from $75 million to $31 million. Armel's action did not modify the terms of the Letter Agreement. Furthermore, the fact that DPAC agreed to pay half of Red Mountain's success fees in October 2005 is just as consistent with the Trustee's position as with Red Mountain's.

61. If DPAC is the entity for purposes of the success fee, Red Mountain's full release exonerated DPC. Contrary to Red Mountain's argument, DPC was not an unconditional guarantor. The Letter Agreement expressly provided that Gregg Davis shall cause the Company [DAC] to assume the obligations hereunder. That includes all the obligations under the Letter Agreement not just the success fee but also the indemnity. To the extent there is any ambiguity (which the Trustee denies), such ambiguity should be construed against the drafter, Red Mountain. The parties intended that the company buying DPC was the party that was to be liable for the Red Mountain fees. That company was DPAC. Red Mountain argues that because the buyer was a different entity, the liabilities were not to be assumed by the buyer. But that is not what the Letter Agreement said or contemplated. There is no language in the Letter Agreement that if a different entity buys DPC, then DPC and not the acquiring entity is responsible for the payment. If Red Mountain had wanted that type of provision in the Letter Agreement, it should have drafted it that way. Nor is there any language in the Letter Agreement that allows Red Mountain to quit performing services prior to closing and still be entitled to a success fee.

62. When Red Mountain released DPAC, it released the guarantor, DPC. Red Mountain argues that because DPC paid the $10,000 in monthly fees before closing, then that somehow establishes a course of performance that DPC was unconditionally obligated. Before the transaction closed there was no buying company to assume the fees, and DPC paid the $10,000 monthly fees (until Red Mountain quit work and went over to the buyer side).

63. In the trial, Mesdag testified that he withdrew from doing any work under the Letter Agreement due to a conflict of interest.[60] Now Red Mountain is arguing that the reason that Red Mountain withdrew was because its work was done.[61] Once Red Mountain changed teams he participated in negotiating the sales price for the shareholders down from $75 to $31 million, including its 20% share of a $2.25 million transaction fee or $450,000.

64. Mesdag does not deny that his conduct constituted a conflict of interest. Rather he points to a boilerplate representation in the Purchase and Sale Agreement

**60.** September 2, 2009 Hearing Transcript at pp. 36–37, 39.

**61.** *Id.* at p. 38.

that to the Company's knowledge no material agreement was in default. But that was a representation for the benefit of the buyer, DPAC, not for the benefit of Red Mountain. Red Mountain does not have any claim for a breach of that representation and cannot use that as a defense. Red Mountain does not have standing to rely on that representation. Section 11.5 of the PSA titled "No–Third–Party Beneficiary" expressly provides that "nothing herein express or implied will give or be construed to give to any Person, other than parties to the agreement, any legal or equitable rights under this agreement."

65. Red Mountain also misconstrues section 4.27 of the PSA which lists the investment bankers, brokers, and finders that have been retained by the Company, who might be "entitled to any fee or commission in connection with the transactions contemplated by this Agreement." That does not entitle Red Mountain to any fee and, in any event, the Trustee paid Red Mountain $250,000 in fees for its part in the Sankaty bridge loan. Also, Jefferies & Company, Inc. is also listed as an investment banker and they were not entitled to, nor paid, any success fee.

### F. Equitable principles do not apply because a contract existed between the parties.

66. Red Mountain argues that the equitable principles of quantum meruit and promissory estoppel entitle it to the success fee. Red Mountain acknowledges that quantum meruit is not a valid theory of recovery in the face of an express contract that covers the same subject matter.[62] But Red Mountain claims that quantum meruit is available if the contract

proves to be invalid. At no point in this proceeding has the Trustee claimed that the Letter Agreement itself is an invalid contract, the Trustee simply argues that Red Mountain is not entitled to recover its success fee under the express terms of the Letter Agreement because of Red Mountain's own actions and breach. Thus, there is no basis for the application of quantum meruit to Red Mountain's claims.

67. Similarly, promissory estoppel is not a valid basis for recovery. Under California law, "[t]he purpose of promissory estoppel is to make a promise binding under certain circumstances without consideration in the usual sense of something bargained for and given in exchange. '[W]here the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel.' "[63] Further, "a promise to perform a pre-existing legal duty is not supported by consideration."[64] Red Mountain had certain obligations under the Letter Agreement and it does not argue that the success fee resulted from work outside of its duties under the Letter Agreement. In fact, Red Mountain argues that it preformed and completed all of its work by October 2005 and withdrew from its obligations under the Letter Agreement. Red Mountain makes no claim for work or services outside the scope of the Letter Agreement—thus its claim for recovery under promissory estoppel must fail.

68. Furthermore, equity does not favor Red Mountain. Red Mountain's conflict of interest has spawned litigation costing the

**62.** Dkt. No. 786 at p. 26.

**63.** *Healy v. Brewster,* 59 Cal.2d 455, 463, 30 Cal.Rptr. 129, 380 P.2d 817 (1963).

**64.** *US Ecology, Inc. v. State of California,* 92 Cal.App.4th 113, 129, 111 Cal.Rptr.2d 689 (2001).

Estate attorneys' fees well in excess of the amounts sought by Red Mountain and reducing the payment to the shareholders.

## CONCLUSION

69. For the reasons set forth herein, the Trustee's objection to Red Mountain's Proof of Claim is SUSTAINED. Accordingly, Red Mountain's Proof of Claim is dismissed with prejudice. All other relief requested but not granted herein is denied.

**IT IS SO ORDERED.**