Filed 12/24/25  Five Points v. City of Irwindale CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| FIVE POINTS, LP, | B337162, B339591 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 22STCV01394) |
| v. | |
| CITY OF IRWINDALE, | |
| Defendant and Respondent. | |

APPEALS from a judgment and a postjudgment order of the Superior Court of Los Angeles County, Daniel M. Crowley, Judge.  Affirmed.

Michelman & Robinson and Steven S. Davis for Plaintiff and Appellant.

Aleshire & Wynder, Adrian R. Guerra, Jamie L. Traxler and June S. Ailin for Defendant and Respondent.

———————————

With this opinion, we address two pending appeals, case Nos. B337162 and B339591.

In B337162, Five Points, LP asks us to reverse the judgment of dismissal and order sustaining a demurrer to the first amended complaint without leave to amend. Five Points also argues, for the first time on appeal, that the first amended complaint alleges facts sufficient to support causes of action for quantum meruit, quasi-contract to prevent unjust enrichment, and rescission.

In B339591, Five Points challenges the trial court's award of attorney fees and costs to the City of Irwindale as the prevailing party.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We recite the facts alleged in Five Points's operative first amended complaint (FAC).

### I. *Relevant Factual Background*

Appellant Five Points is a California limited partnership. Respondent City of Irwindale (the City) is a municipal corporation and Charter City under California law. The City serves as the successor to the Irwindale Community Redevelopment Agency (ICRA).

In 2005, the ICRA acquired three parcels of real property totaling 35.4 acres in Irwindale at 5175 Vincent Avenue (the Site). The Site includes a former mining pit called the "Manning Pit" used for disposal of salt, clay, and sand wash in the 1970's, and various construction debris through the 1980's. The Site held hazardous material, including concentrations of lead and other deleterious substances.

2

In 2007, the ICRA issued a request for proposals for remediation work necessary to develop the Site. It awarded the contract to remediate and fill the Site with clean soil to Dispatch Transportation, LLC (Dispatch).

In 2011, Commodity Trucking Acquisition (Commodity) acquired Dispatch's rights to remediate the Site and the conditional use permit allowing remediation.

In 2012, redevelopment agencies in California, including ICRA, were dissolved and the City became the successor owner of the Site.

Commodity subsequently discovered approximately 359,000 tons of talus material on the Site. In 2013, Commodity, the City, and Five Points's predecessor in interest M&A Gabaee (M&A) entered into an exclusive negotiating agreement (ENA) for the purchase, sale, and development of the Site. The ENA delineated that the development of the Site, i.e., the Project, would include "light industrial and (if viable) commercial improvements on approximately two-thirds (2/3) of . . . the Site . . . including attendant streets, lighting, landscaping and other public improvements . . . and an area of approximately ten (10) acres on . . . the Site . . . to be reserved (i.e. City maintains ownership) for future residential use or development (including a recreation park area)." The ENA required M&A to pay Commodity $300,000 for remediation. The ENA further specified that upon Commodity's completion of the remediation, M&A would commence development of the Project.

II. ***Purchase, Sale, and Development Agreement***

On November 15, 2015, M&A entered into an agreement with the City to purchase and develop a 25.4-acre portion of the 35.4-acre Site (the Agreement). We refer to the 25.4-acre portion

purchased by M&A for $3,058,571.43 as the Property.  The remaining 10 acres were reserved for residential and other compatible uses by the City.  Prior to the close of escrow, M&A assigned its interest in the Agreement to Five Points.

The Agreement and its attachments, such as the Scope of Development, are exhibits to the FAC.  We recite the relevant provisions from the Agreement.

Recital F of the Agreement provides that the parties entered into the ENA "to negotiate the sale of the Site . . . for light industrial and/or commercial development."

Section 10.2, entitled "Scope Of Development & Schedule Of Performance" provides: "The Site shall be developed by Buyer, as provided in the Buyer's scope of development."  The Scope of Development attachment specifies: "Any proposed future project shall be consistent with the City's General Plan and Zoning Code. *The 'Project' to be developed on the Site, when submitted at a future date, shall be light industrial and/or commercial in nature and shall include improvements to enhance the aesthetics of the surrounding neighborhood and protect the residential uses; improvements shall include but not be limited to, attendant streets, lighting, landscaping, decorative perimeter walls, and other public improvements.*  The Project shall include a landscaped 'buffer area' ('Residential Buffer') to separate the Project's industrial components from the residential areas. [¶] Since a project has yet to be identified and submitted for review, project impacts cannot be identified at this time.  Therefore, *any proposed future project on this property shall comply with the requirements of the California Environmental Quality Act*[1]

---

1       California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).

4

through the preparation of an Initial Study that may result in the preparation of a Negative Declaration, Mitigated Negative Declaration, or Environmental Impact Report." (Italics added.)

Section 10.2(e)—entitled "CEQA Compliance"—provides: "*The City shall be responsible for obtaining the approval of this Agreement and any Project as required by CEQA.* Without limitation of the foregoing, Buyer specifically acknowledges and agrees that Buyer shall satisfy all conditions necessary to ensure that the Project conforms to all applicable CEQA requirements." (Italics added.) We note this provision is important because Five Points alleges, based on the italicized language, that the City "committed to secure the approval of an [environmental impact report]."

Section 10.3(a), entitled "Proposed Project's Consistency With Plans and Codes" provides: "*It is expressly understood by the parties hereto that Seller makes no representations or warranties with respect to approvals required by any other governmental entity or with respect to approvals hereinafter required from City*, provided however that Seller shall cooperate with Buyer in procuring the foregoing approvals. *The City and any other governmental body with jurisdiction over the Project reserve full police power authority over the Project.* Nothing in this Agreement shall be deemed to be a prejudgment or commitment with respect to such items or a guarantee that such approvals or permits will be issued within any particular time or with or without any particular conditions." (Italics added.) (The FAC's recitation of section 10.3(a) of the Agreement omits the italicized language.)

## III. *Five Points's Applications for Entitlement and General Plan Amendment*

The FAC alleges Five Points "complied with all of its obligations" under the Agreement. "Relying upon the City's promises and commitments to facilitate Five Points' development of the Property consistent with the [Agreement], Five Points paid millions of dollars to ensure the remediation of the Site." Five Points also "fully reclaimed the 10-acre parcel reserved for the City for development of housing."

On June 5, 2017, Five Points submitted entitlement applications (also referred to as a "Site Plan and Design Review Development Application") to the City for the development and construction of "a single-story ±545,735 square-foot speculative concrete tilt-up building and associated passenger vehicle and truck parking." According to Five Points, this Project was "fully consistent with the Scope of Development" described in the Agreement. Five Points also submitted an application for a general plan amendment to "change the designation of a portion of the Property from residential to industrial/business park."

## IV. *Environmental Impact Report & City Planning Commission Public Hearings*

In January 2019, in response to a letter from the State Attorney General, the City determined the Project required preparation of an environmental impact report (EIR).

On February 17, 2021, the draft EIR was circulated for public review and comment. The draft EIR analyzed 21 environmental study areas and three Project alternatives,

6

offered mitigation measures, and "identified one significant[2] and unavoidable environmental impact in the area of air quality." As a result, the EIR required the City Council's approval of a Statement of Overriding Considerations under CEQA to approve the Project.[3]

On July 21, 2021, the City Planning Commission (Planning Commission) held a public hearing on the Project, the EIR, and the general plan amendment.

The City staff provided its recommendation to the Planning Commission via a staff report. The staff report provides that "[t]he proposed tilt-up building incorporates many of the desired design elements from the Commercial and Industrial Design Guidelines. . . . The design is similar to many of the recently approved developments, which have been designed to closely adhere to the guidelines, while maintaining function and aesthetic uniqueness." The City staff recommended that the

---

[2]     A "significant" effect is defined by Guidelines for the Implementation of CEQA as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water . . . ." (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines); Guidelines, § 15382.)

[3]     If a project would cause significant unavoidable environmental impacts that cannot be sufficiently mitigated, the local government/agency may still approve the project so long as it adopts a Statement of Overriding Considerations. If the specific economic, legal, social, technological, or other benefits of a proposed project outweigh the unavoidable adverse environmental effects, the adverse environmental effects may be considered acceptable. (Pub. Resources Code, § 21081, subd. (b); Guidelines, § 15093.)

Planning Commission "1) Adopt Resolution No. 803(21) recommending that the City Council certify the [final EIR], adopt the Findings of Fact, Statement of Overriding Considerations, and Mitigation Monitoring and Reporting Program; 2) adopt Resolution [No.] 804(21) recommending that the City Council approve [the] General Plan Amendment . . . ; and 3) adopt Resolution No. 805(21) recommending that the City Council approve Site Plan and Design Review . . . subject to the proposed Conditions of Approval for the single or three (3) building alternative."  The City staff "recommended 'that the Planning Commission recommend that the City Council find that *the significant unavoidable adverse impacts of the industrial warehouse project are clearly outweighed by the economic, social, technological, and other benefits of the project*, as set forth in the Statement of Facts and Findings and Statement of Overriding Considerations."  (Italics added.)

Despite the City staff's recommendation to approve the Project, at the public hearing on August 9, 2021, the Planning Commission voted 3-0 to recommend denial of the Project to the City Council and requested that City staff draft resolutions denying the Project on the basis that "the Project's benefits do not outweigh its impacts."

On September 15, 2021, the Planning Commission adopted resolutions recommending that the City Council deny the certification of the EIR and the Project.  On October 13, 2021, the City Council held a public hearing on whether to certify the EIR and approve the Project.  The City Council "declined to certify the EIR . . . and refused to adopt a Statement of Overriding Considerations."

8

On November 19, 2021, Five Points submitted its claim for damages to the City pursuant to Government Code section 945.4 et seq. On December 8, 2021, Five Points's claim was rejected by the City Council. On December 14, 2021, the City notified Five Points of the rejection.

## V. *Five Points's Operative Complaint*

On January 12, 2022, Five Points sued the City. On June 22, 2022, Five Points filed the operative FAC, alleging five causes of action: 1) breach of contract; 2) breach of the covenant of good faith and fair dealing; 3) promissory estoppel; 4) declaratory relief; and 5) taking of property without just compensation.

In addition to the information recited above, Five Points alleges in the FAC that "[b]y assuming the responsibility of remediating the Property, Five Points relieved the City of a major, potentially bankrupting liability. And by assuming the responsibility to develop the Project, Five Points promised to bring to the City a first-class industrial development, increasing the City's tax base and providing . . . jobs. [¶] In exchange, the City made certain promises in the [Agreement] to Five Points that the Property could be developed once remediated." The Agreement "establishes that *the intent* is for the Developer to purchase the Sale Parcels from the City at the proposed price of $3,058,571.43 for future development of light industrial facilities to be approved by the City separately." (Italics added.) Five Points "complied with all of its obligations under the [Agreement]."

The FAC alleges that despite the foregoing, the City breached the Agreement by 1) "failing to cooperate with Five Points in procuring the remaining entitlements and approvals for the Project in violation of Section 10.3(a) of the [Agreement]";

9

2) "denying Five Points' Project in its entirety even though the City had already 'approved the Buyer's conceptual plans and Scope of Development' " per section 10.3(b); 3) "reneging on its contractual commitment to facilitate Five Points' light industrial development on the reclaimed Property"; 4) "failing to secure CEQA compliance as was the City's obligation under the [Agreement]." When the City "declined to certify the EIR because—abandoning its promises, commitments, and representations . . . that the Project, as contemplated, designed, and ultimately proposed, offered significant public benefits and was in the public's interest—the City Council succumbed to the public pressure brought by NIMBY[4] Project opponents and refused to adopt a Statement of Overriding Considerations. And the City Council did so *despite the fact that it promised in the [Agreement] to secure approval of the EIR*." (Italics added.)

Five Points prayed for compensatory damages, consequential damages, a judicial declaration of the rights, duties, and obligations of the parties under the Agreement—including whether 1) "the Project has already been contractually approved by the City in concept and scope"; 2) "the City is required to secure approval of the Project under CEQA"; 3) "the City is obligated to approve the Project consistent with the [Agreement]"—and reasonable costs and attorney fees.

## VI. *The City's Demurrer*

On April 25, 2023, the City filed a demurrer to the FAC. The City argued the FAC failed to state facts sufficient to constitute a legally cognizable cause of action.

---

[4]     "Not In My Backyard"

10

Also on April 25, 2023, the City filed a request for judicial notice of three attachments: 1) Resolution No. 2021-79-3291 where the City Council denied the adoption and certification of the final EIR; 2) Resolution No. 2021-81-3293 where the City Council denied Five Points's site plan and design review application; and 3) City of Irwindale Municipal Code Chapter 17.70 entitled "Site Plan and Design Review." The two Resolutions specify: "The Planning Commission . . . made the finding that the project benefits do not outweigh the significant unavoidable environmental impacts on Air Quality. Specifically, the Planning Commission recommended that the [final EIR] be denied due to the cumulative impact on the region's air quality. Additionally, the emissions threshold for NOx would be exceeded and even with mitigation measures, operational NOx emissions would be above the applicable South Coast Air Quality Management District (SCAQMD) mass emission threshold."

On June 13, 2023, Five Points opposed the demurrer, arguing the FAC "adequately pleads" each of its claims.

On June 20, 2023, the City filed a reply.

VII. ***Hearing and Ruling on the City's Demurrer***

On June 27, 2023, the trial court granted the City's request for judicial notice of all three attachments. The trial court sustained the demurrer to the first four causes of action without leave to amend and to the fifth cause of action (for taking of property without just compensation) with 20 days leave to amend.

Five Points did not file a second amended complaint. Consequently, on November 8, 2023, the trial court entered judgment of dismissal with prejudice against Five Points.

11

Five Points timely appealed. On appeal, it has not challenged dismissal of the fifth cause of action.

## VIII. *The City's Motion for Attorney Fees and Costs*

On January 8, 2024, the City filed a motion for attorney fees and costs, requesting $368,976.50 in fees incurred, $5,000 in anticipated fees, and $25,225.05 in costs. The City argued it is entitled to a fee award because it is a prevailing party in the demurrer resulting in a judgment of dismissal in the City's favor. The City argued it is further entitled to a fee award (per Code Civ. Proc., § 1033.5, subd. (a)(10)(A)) "pursuant to the contractual language in the [A]greement between the parties" in section 12.7, entitled "Attorneys' Fees"—"In the event of any dispute between the parties hereto arising out of the subject matter of this Agreement . . . , the prevailing party in such action shall be entitled to have and to recover from the other party its actual attorneys' fees and other expenses and costs in connection with such action."

In support of its motion, the City submitted the declarations of its attorneys, Adrian Guerra and Jamie Traxler, and copies of their law firm's invoices for legal services rendered from November 2, 2021 through December 31, 2023.

On March 29, 2024, Five Points filed its opposition to the fee motion. Five Points argued the trial court should deny the City's request in its entirety because the City failed to provide the court with a Lodestar calculation; alternatively, Five Points asked the trial court to significantly reduce the "[e]xcessive and [u]nreasonable" amount requested to no more than $75,000. Five Points also requested that the City's request for costs be stricken entirely as they were not listed in the City's cost memorandum.

## IX. *Hearing on the Motion for Fees and Costs*

On April 12, 2024, the trial court heard argument and granted the City's motion in the reduced amount of $316,510.

Five Points timely appealed.[5]

## DISCUSSION

## I. *Standard of Review*

We review de novo a trial court's ruling on a demurrer and examine the operative complaint to determine whether it alleges facts sufficient to state a cause of action under any legal theory. (*King v. CompPartners, Inc.* (2018) 5 Cal.5th 1039, 1046 (*King*); *Dudek v. Dudek* (2019) 34 Cal.App.5th 154, 163 (*Dudek*).) We will affirm an order sustaining a demurrer on any proper legal ground whether or not the trial court relied on that theory or it was raised by the defendant. (*Fischer v. Time Warner Cable Inc.* (2015) 234 Cal.App.4th 784, 790 (*Fischer*).)

In addition, " '[w]hen a demurrer is sustained *without leave to amend*, "we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm." ' " (*Dudek*, *supra*, 34 Cal.App.5th at p. 163, italics added.) Here, appellant shoulders the burden to show a reasonable possibility the complaint can be amended to state a cause of action (*id.* at

---

[5] When a party wishes to challenge both a final judgment *and* a postjudgment attorney fee order, the normal procedure is to file *two separate appeals*: one from the final judgment, and a second from the postjudgment order. (*Doe v. Westmont College* (2021) 60 Cal.App.5th 753, 762.) That is exactly what Five Points has done here.

13

pp. 163–164; *King, supra*, 5 Cal.5th at p. 1050); this showing can be made in the first instance to the appellate court (*Roman v. County of Los Angeles* (2000) 85 Cal.App.4th 316, 322).[6]

---

[6]     On December 23, 2024, the City filed a request for judicial notice of three exhibits: 1) the recorded December 10, 2015 grant deed transferring the Property to Five Points; 2) the January 31, 2019 comment letter from the Attorney General in response to the City's initial study/mitigated negative declaration; and 3) the May 25, 2021 comment letter from the Attorney General in response to the draft EIR.  Five Points filed its opposition to the City's request 81 days later, on March 14, 2025.  Because opposition to a request for judicial notice must be filed within 15 days after the request is filed, i.e., on or before January 8, 2025, Five Points's opposition is not timely and we do not consider it. (Cal. Rules of Court, rule 8.54(a)(3).)

In addition, after appeal B337162 was fully briefed, Five Points filed a request for judicial notice on March 19, 2025, for two exhibits totaling over 900 pages: 1) the January 7, 2019 fill completion report prepared on behalf of the City "to document the remediation of inert landfill material that was previously deposited in the portion of the Manning Pit"; and 2) the transcript of the August 9, 2021 Planning Commission public hearing.  On April 1, 2025, the City filed its opposition to the judicial notice request.

We deny both requests as the documents are not relevant to our review of the two appeals before us.  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063, disapproved on other grounds by *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276; see also *American Cemwood Corp. v. American Home Assurance Co.* (2001) 87 Cal.App.4th 431, 441, fn. 7; *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 548.)

## II.  *Demurrers, Generally*

A demurrer tests the legal sufficiency of the challenged pleading.  (*Milligan v. Golden Gate Bridge Highway & Transportation Dist.* (2004) 120 Cal.App.4th 1, 5; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)  In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we accept as true all material facts properly pleaded in the complaint that are not inconsistent with other allegations, exhibits, or judicially noticed facts; we do not assume the truth of contentions, deductions, or conclusions of fact and law.  (*Dudek*, *supra*, 34 Cal.App.5th at pp. 163–164; *Morris v. JPMorgan Chase Bank, N.A.* (2022) 78 Cal.App.5th 279, 292; *Estate of Holdaway* (2019) 40 Cal.App.5th 1049, 1052.)  "We examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory regardless of the label attached to a cause of action."  (*Fischer*, *supra*, 234 Cal.App.4th at p. 790.)  The judgment of dismissal after a sustained demurrer must be affirmed if the challenged pleading fails to plead an essential element or if the allegations disclose some defense or bar to recovery.  (*Brown v. Crandall* (2011) 198 Cal.App.4th 1, 8.)  We are to affirm if any of the grounds for demurrer raised by defendant is well taken and disposes of the causes of action of the FAC pending before us.  (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

## III.  *CEQA, Generally*

CEQA and its implementing regulations, Guidelines, embody California's strong public policy of protecting the environment.  (*Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 428 (*Arcadians*).)  CEQA

was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment. (*Id.* at pp. 428–429.) CEQA provides a three-tiered process to guide agencies in carrying out or approving a project which may have a significant effect upon the environment. (*Id.* at p. 429; see Pub. Resources Code, § 21067.)

The first tier is jurisdictional, requiring the agency to conduct a preliminary review to determine whether the proposed activity is subject to CEQA. (*Arcadians*, *supra*, 88 Cal.App.5th at p. 429; *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636.) CEQA applies if the proposed activity is a "Project" under the statutory definition, unless the project falls within one of several exemptions to CEQA. (See Pub. Resources Code, §§ 21065, 21080.) If the agency finds the project does not fall within an exemption, the agency must proceed to the second tier. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792; *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1186 (*Union*); see Guidelines, § 15063.)

The second tier of the CEQA process requires the agency to conduct an initial study to determine whether the project may have a significant effect on the environment. (Guidelines, § 15063; *Arcadians*, *supra*, 88 Cal.App.5th at p. 430.) If the initial study finds no substantial evidence that the project may

16

have a significant effect, the agency is excused from preparing an EIR, and instead, must prepare a negative declaration, briefly describing the reasons supporting the determination.  Here environmental review ends.  (*Arcadians*, at p. 430; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390; Guidelines, §§ 15063, subd. (b)(2), 15070.)  If the initial study identifies potentially significant environmental effects but (1) those effects can be fully mitigated by changes in the project, and (2) the project applicant agrees to incorporate those changes, then the agency must prepare a mitigated negative declaration.  (*Arcadians*, at p. 430.)

Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact that cannot be mitigated—and thus, the project does not qualify for a negative declaration—then the third tier of the CEQA process is reached.  (Pub. Resources Code, §§ 21100, 21151; Guidelines, §§ 15063, subd. (b)(1), 15080; see *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1020.) The agency must prepare and certify an EIR on the proposed project before approving or proceeding with the project.  (*Union*, *supra*, 7 Cal.5th at p. 1187.)  The EIR is the "heart" of CEQA, providing agencies with in-depth review of projects with potentially significant environmental effects.  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123; *Pacific Palisades Residents Assn., Inc. v. City of Los Angeles* (2023) 88 Cal.App.5th 1338, 1363.)

"[A]n agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated, while subject to review for abuse of discretion [citation], lies at the core of the lead agency's discretionary

17

responsibility under CEQA and is, for that reason, not lightly to be overturned." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 368.)

Keeping these principles in mind, we turn to the issues at hand.

## IV.    *The Trial Court Properly Sustained the Demurrer to the FAC's Four Causes of Action*

We review the FAC to ascertain whether it states facts sufficient to constitute legally viable causes of action.

### A.    Breach of Contract

Five Points argues the FAC adequately alleges the City's "refusal to certify the EIR and approve the Project was unreasonable, arbitrary and capricious" and the trial court "was not in a position to conclude otherwise based on the pleadings alone."

The elements of a breach of contract cause are: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach. (*Aton Center, Inc. v. United Healthcare Ins. Co.* (2023) 93 Cal.App.5th 1214, 1230.)

Five Points alleges the Agreement is a written contract for the purchase of the Property for $3,058,571.43 and its development that "shall be light industrial and/or commercial in nature and shall include improvements to enhance the aesthetics of the surrounding neighborhood and protect the residential uses." Five Points cites to the Agreement's language that provides that the "Seller [(i.e., the City)] shall cooperate with Buyer [(i.e., Five Points)] in procuring the foregoing approvals" and that the City "shall be responsible for obtaining the approval

of this Agreement and any Project as required by CEQA."  Five Points "complied with all of its obligations" under the Agreement but the City breached the Agreement by "failing to cooperate . . . in procuring the remaining entitlements and approvals for the Project" and "failing to secure CEQA compliance as was the City's obligation under the [Agreement]."

The problem for Five Points is that the allegations cannot withstand a plain reading of the Agreement.

"A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."  (Civ. Code, § 1636.)  Such intent is to be inferred, if possible, solely from the written provisions of the contract.  (*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415.)  " 'If contractual language is clear and explicit, it governs.' " (*Ibid.*)

While Five Points cites to and makes much of section 10.2(e)'s language providing that the City "shall be responsible for obtaining the approval of this Agreement and any Project as required by CEQA," it does not explain away the rest of the language of section 10.2(e) which specifies that the "Buyer [(i.e., Five Points)] shall satisfy all conditions necessary to ensure that the Project conforms to all applicable CEQA requirements." Thus, while the City is "responsible for obtaining the approval . . . as required by CEQA," the onus to ensure that the Project satisfies and conforms to CEQA requirements expressly remained with Five Points.  And Five Points failed to satisfy CEQA as it was determined by the Planning Commission that the Project's impacts on air quality were "significant" and "unavoidable," even with the imposition of mitigation measures, and that the "project

19

benefits do not outweigh the . . . impacts on Air Quality." The City's duty to "cooperate," in the context of the Agreement, does not equate to a duty to approve regardless of its police power and duty to the public under CEQA.

Moreover, section 10.3(a) of the Agreement expressly specifies that the City "reserve[d] full police power authority over the Project." Land use regulations,[7] including the power to zone, involve the exercise of the sovereign's police power. (*Delucchi v. County of Santa Cruz* (1986) 179 Cal.App.3d 814, 823 (*Delucchi*).) " ' " 'The police power being in its nature a continuous one, must ever be reposed somewhere, and cannot be barred or suspended by contract or irrepealable law. It cannot be bartered away even by express contract.' [Citations.] It is to be presumed that parties contract in contemplation of the inherent right of the state to exercise unhampered the police power that the sovereign always reserves to itself for the protection of peace, safety, health and morals. Its effect cannot be nullified in advance by making contracts inconsistent with its enforcement . . . ." ' " (*Ibid.*) It is

---

[7] The City's land use regulations are set forth in title 17 of the Irwindale Municipal Code section 17.70.010, which provides: "[N]o person shall construct any building or structure or make structural and physical improvements, additions, extensions and/or exterior alterations, and no permit shall be issued for such construction until the site plan and design has been submitted to, reviewed by, and approved in accordance with this chapter. The property may only be developed, used and maintained in accordance with the approved site plan and design review and the commercial and industrial design guidelines." Irwindale Municipal Code section 17.70.050 further delineates the process and criteria of the City in reviewing and/or approving a site plan and design review application.

settled that the government may not contract away its right to exercise the police power in the future. (*Avco Community Developers, Inc. v. South Coast Regional Com.* (1976) 17 Cal.3d 785, 800 (*Avco*).) Thus, even the dubious assumption that the Agreement purports to guarantee approval of a development project prior to the City's (or City Council's) proper consideration of it is invalid and unenforceable as contrary to public policy. (*Delucchi*, at p. 823; *Avco*, at p. 800.)

Five Points misreads the language of the Scope of Development attachment to the Agreement—"The 'Project' *to be developed* on the Site, *when submitted at a future date*, shall be light industrial and/or commercial *in nature*"—as the equivalent of a contractual guarantee by the City to approve any proposed development application submitted by Five Points that fits the "light industrial and/or commercial" description. (Italics added.) No such sweeping effect can be reasonably inferred from the Agreement, which includes no language evincing an intent by the City to relinquish its discretionary authority or to pre-approve any future development proposal solely by virtue of its classification as "light industrial and/or commercial."

Relying on the allegations regarding the City staff's report recommending approval of the Project based on "economic, social, technological, and other benefits of the project," Five Points argues that "the City . . . in approving the [Agreement] consistent with the ENA effectively promised [Five Points] it would, if necessary, adopt a Statement of Overriding Conditions in order to certify the EIR and approve the Project." Five Points's interpretation is not supported by law. " '[A]n agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated . . . lies at

21

the core of the lead agency's *discretionary* responsibility under CEQA." (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 603, italics added.) "Land use regulations, such as [CEQA], involve the exercise of the state's police power [citation], and it is settled that the government may not contract away its right to exercise the police power in the future." (*Avco, supra,* 17 Cal.3d at p. 800.) CEQA confers the duty upon the local lead agency to produce an adequate EIR and this statutory obligation may not be the consideration for a contract or promise, nor may the City bargain away its constitutional duty to regulate development. (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 730.) "[A] local government may not contract away its right to exercise its police power in the future, and land use regulations involve the exercise of police power." (*Alameda County Land Use Assn. v. City of Hayward* (1995) 38 Cal.App.4th 1716, 1724.)

Finally and most important, section 10.3(a) of the Agreement further provides that "[n]othing in this Agreement shall be deemed to be a prejudgment or commitment with respect to such items or a guarantee that such approvals or permits will be issued within any particular time or with or without any particular conditions." Despite the unambiguous and clear wording of this portion of section 10.3(a)—which Five Points failed to include in its FAC— Five Points alleges that the City "reneg[ed] on its contractual commitment" and "fail[ed] to secure CEQA compliance." The plain language of the Agreement contradicts the allegations of the FAC.

The bottom line is that there was no contractual obligation for the City to approve the Project, so there can be no breach. The City's express police power reservation in the Agreement as well as underlying substantive law prohibit the City from contracting away its police power or approving land development applications in advance.

B.    Breach of Covenant of Good Faith and Fair Dealing

Five Points contends the FAC adequately alleges the City "acted in bad faith by arbitrarily and unreasonably rejecting the Staff Report's recommendation to adopt a 'Statement of Overriding Considerations,' certify the EIR and approve the Project."

"The prerequisite for any action for breach of the implied covenant of good faith and fair dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." (*Smith v. City and County of San Francisco* (1990) 225 Cal.App.3d 38, 49.)  Thus, every contract imposes on each party a duty of good faith and fair dealing in each performance and in its enforcement.  (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1393; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683.)  " 'The implied covenant of good faith and fair dealing is *limited to assuring compliance with the express terms of the contract*, and cannot be extended to create obligations not contemplated by the contract.' " (*Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1094, some italics added.)  "As to the scope of the covenant, ' "[the] precise nature and extent of the duty imposed by such an implied promise will depend on the contractual purposes." ' " (*Foley*, at p. 684.)

The cause of action alleging breach of the implied covenant of good faith and fair dealing fails for the same reasons as the cause of action for breach of contract. Any proposed project was specifically contingent on CEQA review as well as site plan and design review, with no "prejudgment or commitment with respect to such items or a guarantee that such approvals or permits will be issued."

C. Promissory Estoppel

Five Points contends the FAC sufficiently states a cause for promissory estoppel because the FAC adequately alleges a promise by [the City] that induced Five Points's "reasonable and detrimental reliance, such that [Five Points] may recover its damages even in the absence of proof of a breach of contract."

Elements of promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance by party to whom promise is made; (3) reliance must be both reasonable and foreseeable; and (4) party asserting estoppel must be injured by the party's reliance. (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872, 897 (*Jolley*).) Promissory estoppel is a doctrine which employs equitable principles to satisfy the requirement that consideration must be given in exchange for the promise sought to be enforced. (*Poway Royal Mobilehome Owners Assn. v. City of Poway* (2007) 149 Cal.App.4th 1460, 1471 (*Poway*).)

The FAC provides that "promises were made *orally and in writing*" by the City that it shall approve the development of the Property for "light industrial and/or commercial uses" and will "cooperate[] and assist in obtaining all the entitlements and approvals necessary to carry out the Project, including approval of the Project under CEQA." (Italics added.)

24

Promises made "in writing" refers to the promises made in the Agreement. "The doctrine of promissory estoppel is inapplicable where the promisee's performance was requested by the promisor at the time the promise was made." (*Healy v. Brewster* (1963) 59 Cal.2d 455, 463.) "Under such circumstances, the only reliance which can make the promisor's failure to perform actionable is the promisee's doing what was requested. If that reliance was detrimental, it would constitute consideration. If it was not detrimental, it would not constitute consideration; and since detrimental reliance is an essential feature of promissory estoppel, that doctrine could not be invoked to make the promisor liable." (*Ibid.*) In other words, where the promisee's reliance was bargained for, the law of consideration applies; and it is only where the reliance was unbargained for that there is room for application of the doctrine of promissory estoppel. (*Ibid.*) Here, Five Points's reliance was bargained for, as the City negotiated the Agreement with Five Points's predecessor in interest. The FAC alleges that Five Points's consideration under the Agreement were the City's "clear promises . . . that it approved the development of the Property for light industrial and/or commercial uses" and would "facilitate, cooperate, and assist in obtaining all the entitlements and approvals necessary to carry out the Project." Thus, promissory estoppel is inapplicable here.

As for the promises "made orally" by the City—the FAC alleges no facts to support that claim other than the conclusory allegation that the City's promises "were made orally and in writing." Plus, the Agreement expressly states in section 12.12[8]

---

[8]     Section 12.12 of the Agreement provides: "This Agreement and other documents incorporated herein by reference contain

25

that it encompasses all of the parties' bargained for promises—thus, any oral promise purportedly made by the City does not alter, supersede, or supplement the terms of the written Agreement.

Furthermore, "[i]t is well established that 'an estoppel will not be applied against the government if to do so would effectively nullify "a strong rule of policy, adopted for the benefit of the public." ' " (*Poway*, *supra*, 149 Cal.App.4th at p. 1471.) California courts " ' "have been careful to apply the rules of estoppel against a public agency only in those special cases where the interests of justice clearly require it." ' " (*Ibid.*) The " ' "facts upon which such an estoppel must rest go beyond the ordinary principles of estoppel and each case must be examined carefully and rigidly to be sure that a precedent is not established through which, by favoritism or otherwise, the public interest may be mulcted or public policy defeated." ' " (*Ibid.*) The FAC does not allege exceptional circumstances necessary to justify application of the promissory estoppel doctrine against the City.

D. <u>Declaratory Relief</u>

Declaratory relief generally operates prospectively to declare future rights, rather than to redress past wrongs. (*Jolley*, *supra*, 213 Cal.App.4th at p. 909.) It serves to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs. (*Ibid.*) In short, the remedy is to

---

the entire understanding between the parties relating to the transaction contemplated hereby and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged herein and shall be of no further force or effect."

26

be used in the interests of preventive justice, to declare rights rather than execute them. (*Ibid.*) "To qualify for declaratory relief, [a party] would have to demonstrate its action presented two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the party's] rights or obligations.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582.)

Five Points argues the trial court "incorrectly determined that [the] fourth cause of action for Declaratory Relief is duplicative of its other claims." We disagree.

Where a trial court has concluded the plaintiff did not state sufficient facts to support a statutory claim and therefore sustained a demurrer as to that claim, a demurrer is also properly sustained as to a claim for declaratory relief which is "wholly derivative" of the statutory claim. (*Ball v. FleetBoston Financial Corp.* (2008) 164 Cal.App.4th 794, 800; *Smyth v. Berman* (2019) 31 Cal.App.5th 183, 192.) The language of the declaratory relief cause of action in the FAC is wholly derivative of the FAC's first, second, and third causes of action, which fail. It follows that the claim for declaratory relief also fails. (See Code Civ. Proc., § 1061 ["The court may refuse to exercise the power granted . . . in any case where its declaration or determination is not necessary or proper at the time under all the circumstances."].)

Five Points argues the trial court erred in failing to treat the cause of action for declaratory relief as a petition for writ of mandate. (*Scott v. City of Indian Wells* (1970) 6 Cal.3d 541, 546 [an action for declaratory relief to review an administrative order should be regarded as a petition for writ of mandate for purpose

27

of ruling upon a general demurrer].) Even if we regard the FAC's fourth cause of action for declaratory relief as a petition for a writ of mandate, we conclude it fails to allege facts justifying the relief sought. The FAC alleges a breach of the parties' Agreement and requests resulting damages—not a judicial review of the City's decision. The judicial determination requested in the FAC is that the City "has a duty to cooperate . . . in securing entitlements, permits and approvals for the Project, and ultimately approve the Project or else be declared in breach of the [Agreement]." While Five Points argues on appeal that the City's decision was "arbitrary" and "capricious," no such allegation appears in the FAC. Having failed to bring the FAC's allegations within the provisions of section 1094.5 of the Code of Civil Procedure, Five Points has failed to state a cause of action for relief by writ of mandate.

## V.    *Leave to Amend*

### A.    The FAC's Four Causes of Action

Five Points did not propose an amendment or an explanation as to how it intends to cure the defects of the FAC. That omission alone supports the trial court's order denying leave to amend. (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 444 (*Brenner*).) Nor has Five Points proposed amendments on appeal. Five Points merely "requests that to the extent this Honorable Court believes any amendment to [its] pleading would be necessary to support the arguments made herein, it can and should reverse the Judgment and permit [it] to file an amended pleading for that purpose."

This is not enough.  A plaintiff 'must show in what manner the complaint can be amended and how that amendment will change the legal effect of his pleading.  *The assertion of an abstract right to amend does not satisfy this burden.*" (*Rakestraw v. California Physicians' Service* (2000) 81 Cal.App.4th 39, 43, italics added.)  The issue is thus forfeited. (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948; *Nielsen v. Gibson* (2009) 178 Cal.App.4th 318, 324.)

B.     Alternative Claims for Quasi-Contract, Quantum Meruit, and Rescission

For the first time on appeal, Five Points argues the FAC alleges sufficient facts to entitle it to recover damages under two legal theories not considered by the trial court: quasi-contract to prevent unjust enrichment by the City and quantum meruit for the reasonable value of Five Points's services.  Five Points contends it is "entitled to seek to recover its economic losses under both theories so that [the City] is not unjustly enriched at [Five Points's] expense and so that a disproportionately harsh penalty is not imposed on [Five Points]."  Five Points also argues for the first time via its reply brief that we "should remand this case . . . to permit [Five Points] to assert a new cause of action for rescission."  Five Points requests leave to amend the FAC to add these claims.  It argues the trial court erred in sustaining the City's demurrer because the trial court failed to consider other possible legal theories Five Points seeks to allege.

These arguments are without.

A quantum meruit recovery "rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice.  [Citations.]  However, *it is well settled that there is no equitable basis for an implied-in-law promise to*

29

*pay reasonable value when the parties have an actual agreement covering compensation.*" (*Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419, italics added.) "Quantum meruit is an equitable theory which supplies, by implication and in furtherance of equity, implicitly missing contractual terms. Contractual terms regarding a subject are not implicitly missing when the parties have agreed on express terms regarding that subject. A quantum meruit analysis cannot supply 'missing' terms that are not missing. 'The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability. . . .' " (*Ibid.*)

Similarly, "*as a matter of law*, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights." (*California Medical Assn. v. Aetna U.S. Healthcare of California, Inc.* (2001) 94 Cal.App.4th 151, 172 (*Aetna U.S.*); see *Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1387 ["There cannot be a valid express contract and an implied contract, each embracing the same subject, but compelling different results."]; *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.* (1996) 44 Cal.App.4th 194, 203 ["[I]t is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter. . . . The [party] must allege that the express contract is void or was rescinded in order to proceed with its quasi-contract claim."].)

Five Points's alternative claims also fail because any benefit conferred upon the City by Five Points was simply an

incident to Five Points's performance of its own obligations per the Agreement. (*Aetna U.S.*, *supra*, 94 Cal.App.4th at p. 174.) As noted in *Major-Blakeney Corp. v. Jenkins* (1953) 121 Cal.App.2d 325, 340–341, " 'A person who, incidentally to the performance of his own duty or to the protection or the improvement of his own things, has conferred a benefit upon another, is not thereby entitled to contribution.' " (*Ibid.*; see 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 97, pp. 126–127 ["where the plaintiff acts in performance of his own duty or in protection or improvement of his own property, any incidental benefit conferred on the defendant is not unjust enrichment"].)

Five Points's reliance on *Russell City Energy Co., LLC v. City of Hayward* (2017) 14 Cal.App.5th 54 (*Russell*) is misplaced. In *Russell,* a city agreed not to impose any taxes or fees upon a plaintiff who was building a power plant in exchange for $10 million. (*Id.* at pp. 57–58.) The agreement was finalized and the plaintiff paid the sum. (*Ibid.*) Voters later passed a measure imposing a utility tax on all utility users, including plaintiff. In suing the city, plaintiff was "not attempting to imply the existence of an extra-contractual agreement, nor [was plaintiff] attempting to enforce the invalid provision of the agreement. Rather, [plaintiff was] seeking recovery of at least some of the consideration it provided *because the City was unable to deliver its promised performance.*" (*Id.* at p. 73, italics added.) The *Russell* court did not make a sweeping ruling and instead based its holding on unique circumstances. Part of the benefit the city was to provide to the plaintiff was a promise not to impose taxes or fees. Once that term was removed, the contract remained, but the plaintiff was placed in a much worse position. The plaintiff could not pursue a contract claim because the specific provision of

the contract which the defendant had breached was declared invalid. (*Id.* at pp. 64–65, 69; see Cal. Const., art. XIII, § 31.)

Here, the facts are similar to *Russell* in that an express agreement exists; the similarities end there. Five Points's argument based upon *Russell* does not persuade this court to depart from the general principle that quasi-contract actions are not available against the government.

As for Five Points's request to amend the FAC to add a cause of action for rescission, we do not consider it. We will not ordinarily consider issues raised for the first time in a reply brief. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158.) Fairness militates against allowing an appellant to raise an issue for the first time in a reply brief because consideration of the issue deprives respondent of the opportunity to counter appellant by raising opposing arguments about the new issue. (*Ibid.*)

We affirm the trial court's order denying leave to amend. (See *Brenner*, *supra*, 113 Cal.App.4th at p. 444.)

## VI. *Attorney Fees and Costs*

The second appeal (B339591) contends only that if the trial court's judgment of dismissal is reversed, the award of fees and costs should also be reversed. (See, e.g., *Shirvanyan v. Los Angeles Community College Dist.* (2020) 59 Cal.App.5th 82, 107 ["an order awarding attorney fees 'falls with a reversal of the judgment on which it is based' "].) Five Points does not challenge the award on the merits.

Because we affirm the judgment of dismissal, it follows here that the postjudgment award of attorney fees and costs be affirmed as well.

## DISPOSITION

The judgment of dismissal in favor of the City is affirmed. The postjudgment order granting the City's motion for attorney fees and costs is affirmed. The City shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                     STRATTON, P. J.

We concur:



WILEY, J.



RUBIN, J.*

---

\*     Retired Presiding Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.